Filed 3/25/21  In re S.F. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re S.F., a Person Coming Under the Juvenile Court Law. | B306792 <br><br> (Los Angeles County Super. Ct. No. 19CCJP04598A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> SYDNEY L., <br><br> Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Emma Castro, Judge Pro Tempore.  Affirmed as modified.

Lori Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Navid Nakhjavani, Principal Deputy County Counsel, for Plaintiff and Respondent.

* * * * * *

The juvenile court ordered a mother in a pending dependency case not to contact the former social worker on that case or anyone else in that worker's special division. Mother appeals. Because the restraining order is supported by substantial evidence, we affirm. However, we modify the order to conform to the trial court's oral pronouncement and to the Department's concession on appeal.

## FACTS AND PROCEDURAL BACKGROUND

### I.    Facts[1]

#### A.    *Underlying facts*

Sydney L. (mother) gave birth to S.F. in May 2019.

"S.F. is a medically fragile child. She was born with macrocephaly (that is, swelling of the brain) and with Dandy Walker Syndrome (that is, a malformation of the cerebellum). To address the swelling, doctors inserted a shunt in her skull to drain excess fluid that requires constant monitoring. As a result of her birth defects, S.F. will never walk or talk."

Mother is often physically violent and verbally aggressive with others. In December 2018 (and while pregnant with S.F.), mother assaulted the ex-girlfriend of S.F.'s biological father. In

---

[1]    These facts are largely drawn from our prior unpublished opinion in this case. (*In re S.F.* (Apr. 9, 2020, B300870) [nonpub. opn.].)

2

May 2019, she ripped a necklace off of the father as he was wearing it. When medical staff at the emergency room told mother they could not immediately skip S.F. to the front of the line of waiting patients, mother became "aggressive" and "combative" and, on one occasion in late June 2019, told the staff she would "blow[] . . . up" the hospital.

"Mother has repeatedly ignored the advice of medical personnel. In the first few months of S.F.'s life, mother took her to the emergency room five times for care; on every occasion, mother started to leave when she was told she would have to wait. The medical personnel advised mother against leaving each time, but she either left anyway or stayed only after law enforcement was called. Mother also did not immediately fill S.F.'s prescriptions."

**B.    *Exertion of dependency jurisdiction over S.F.***

"In July 2019, the [Los Angeles County Department of Children and Family Services (the Department)] filed a petition asking the juvenile court to exert dependency jurisdiction over S.F."

In September 2019, following a contested hearing, the juvenile court exerted dependency jurisdiction over S.F. on the grounds that (1) mother is a "current abuser of marijuana, which renders [her] incapable of providing regular care and supervision" and "places [S.F.] at risk of serious physical . . . harm" due to her "tender age" and "her special medical needs," (2) mother has "a history of assaultive behavior towards others" that "shows a lack of self-control, self-restraint, and impulse control" that "place[s] [S.F.] at[] risk of serious harm," and (3) mother has "medically neglected [S.F.] and failed to follow medical advice" by leaving "the emergency room against medical professional[s']

advisements" and by not filling prescriptions, all of which "place[] [S.F.] at risk of serious physical harm." Each basis is ground in Welfare and Institutions Code section 300, subdivision (b).[2]

At that same hearing, the court removed S.F. from mother's custody and ordered the Department to provide mother reunification services, which included anger management counseling, as well as monitored visits.

Mother appealed the sufficiency of the evidence underlying the drug abuse allegation, and we affirmed. (*In re S.F.*, *supra*, B300870.)

### C. *Reunification period*

Although the Department marshalled many service providers to assist mother in completing the reunification case plan prescribed by the juvenile court, mother responded to their efforts with aggressiveness, belligerence, rudeness and threats.

Mother's behavior was directed at nearly everyone. When officials from in-home support services came to evaluate mother's home to determine whether she was eligible for such services, mother was so "aggressive" and "threat[ening]" that the officials could not conduct their evaluation. Mother was so "belligerent" with the personnel at two drug-testing facilities that they asked not to see her again. Mother called the person answering the phone at her own attorney's office a "bitch." Mother was "aggressive" with the people with whom the Department placed S.F. after the removal order—even though they were mother's own relatives: In early August 2019, mother texted the paternal aunt caring for S.F. with the following message: "Bitch, go die if you hurt my baby I will kill you. It's no threat it's a promise"; in

---

[2]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

4

mid-March 2020, mother challenged a subsequent caregiver to a fistfight.

Mother directed her most vitriolic behavior at the Department and its social workers. Due to S.F.'s special medical needs, the Department initially assigned S.F.'s case to the Health Management Division, which is a unit specially trained in dealing with children with such special needs.

Mother was regularly abusive to the Health Management Division's staff when they supervised mother's monitored visits with S.F.: In July 2019, she called a Department receptionist a "bitch" when the receptionist asked mother to sign in to the office; in mid-August 2019, mother cussed and yelled at a security guard and receptionist, and told a social worker she wanted to "see [her] fucking supervisor"; and in mid-September 2019, mother demanded a different monitor because, based on the "bad vibes" she got, she surmised he was both a "sexual perpetrator" and a "racist."

Mother was also regularly abusive toward Christina Misa (Misa), the social worker assigned to S.F.'s case until June 2020. The incidents included the following:

● In late August 2019, mother demanded that the monitored visits occur when it was convenient for *mother* and stated that she did not "give a fuck what" was convenient for S.F.'s caregiver; she also told Misa that mother did not "give a fuck what [she] [did]" and warned Misa that Misa was "pissing [her] off."

● Two days after that, mother told another social worker in the Health Management Division that "you fucking bitches don't give a fuck" and "are not working hard enough," that they did not care, and that "maybe it's time for [mother] to

call [her] attorney."

● In late September 2019, mother became "irate" with Misa for enforcing the juvenile court's order shortening the duration of mother's visits, and demanded that Misa immediately return to mother the infant car seat the caregiver was using as well as the clothes S.F. was currently wearing, and persisted in her demands even after Misa pointed out to mother that mother was effectively asking caregiver to drive mother's own infant child away without a car seat and naked; for obvious reasons, Misa refused mother's demand.

● Five days later, when the caregiver was 15 to 20 minutes late for a visit, mother called a third party on her cell phone and loudly complained that "these bitches got me waiting here and fucking wasting my time."

● In mid-October 2019, when Misa informed mother that she would receive one fewer weekly visit due to a holiday, mother said, "I don't give a fuck," demanded that the visit be re-scheduled notwithstanding the holiday, told Misa—when Misa asked mother not to cuss—that she was "not fucking cussing," and then proceeded to call Misa 67 times in 10 minutes without leaving a message.

● In mid-March 2020, as Misa was trying to schedule virtual visits in all of her cases in light of the recent COVID-19 shutdown, mother called Misa 46 times in a short period of time in order to have *her* visits with S.F. scheduled. When Misa did not pick up mother's calls, mother proceeded to send a sequence of text messages to Misa laced with profanity, insults and invective: "Bitch my call is important"; "tf [the fuck] you mean bitch idgaf [I don't give a fuck]"; "Bitch I've been calling y'all hoes since Friday"; "Don't read my text respond bitch"; "Yes you are a

bitch"; "I need to speak to my fucking daughter just cuz you never pushed a kid out I need to speak what came out of me"; "Where tf [the fuck] is my visits how"; "Hoe"; "Show all this to the court idgaf [I don't give a fuck] y'all see me calling your weird ugly ass." (*Sic*.)  When Misa got to mother on her list of parents and called mother to schedule virtual visits with S.F., mother proceeded to call Misa a "bitch."

● In mid-April 2020, mother told another social worker in the Health Management Division that mother did not want her "hoe ass" to supervise the monitored visit.  When Misa called mother to solicit her input on a monitor, mother told Misa that "you mother fuckers don't care about me and my child."  Mother then proceeded to call Misa 40 times in 15 minutes.

## II.  Procedural Background

On June 30, 2020, the Department filed a petition seeking a temporary restraining order (TRO) and a permanent injunction to protect Misa.  Misa recounted the incidents set forth above, and explained that mother's "pattern of verbal intimidation" and mother's penchant for making "repeated harassing and abusive calls" caused Misa "emotional distress" and also "impeded" Misa's "ability to do [her] job."

Later that same day, the juvenile court held a hearing where mother appeared through her counsel.  The court issued a TRO and set a hearing on whether to issue a preliminary injunction for July 20, 2020.

On July 20, 2020, the juvenile court issued a three-year injunction that prohibited mother from (1) having any contact with Misa or coming within 100 yards of Misa, her home or her place of work, (2) "com[ing] to the Health Management Division . . . office unless she has an appointment that is confirmed with a

7

supervisor in advance by [five] days" or "*contact[ing], directly or indirectly, telephone or send messages, mail or email to* [*Department*] *personnel or employees except through her attorney of record*." (Italics added.) In issuing the injunction, the court found it to be "necessary to ensure the physical and emotional well[-]being of [Misa] from . . . emotional harm, harassment, abusive behavior."

Mother filed this timely appeal.

## DISCUSSION

In this appeal,[3] mother argues that the juvenile court erred in issuing the injunction because (1) the Department assigned S.F.'s case to a new social worker, so Misa is no longer in mother's proverbial cross-hairs, and (2) the injunction is overbroad because the italicized language in the injunction prohibits her direct contact with *all* Department personnel, which would interfere with her right to receive reunification services.

We can quickly dispose of mother's second argument. At the time the Department requested the injunction, the Department explained that it had reassigned mother's case to its Compton office and that its request for a no-direct-contact injunction was limited to Department personnel in the Health Management Division office. At that same time, the juvenile court seemed to agree with the Department's narrower request, commenting that the injunction "doesn't mean that [mother] can't go to the Compton . . . office." On appeal, the Department urges us to read the italicized language consistent with its initial

---

[3]      "[A] restraining order issued in a juvenile dependency proceeding is directly appealable . . . ." (*In re Cassandra B.* (2004) 125 Cal.App.4th 199, 208 (*Cassandra B.*), citing Code Civ. Proc., § 904.1, subd. (a)(6).)

8

request and with the juvenile court's contemporaneous comments.  Whether we view the Department's position on appeal as a concession or we elect to give more weight to the court's oral pronouncement (*In re Maribel T.* (2002) 96 Cal.App.4th 82, 86; but see *In re Jerred H.* (2004) 121 Cal.App.4th 793, 798, fn. 3), we modify the italicized language to be limited to "Department personnel or employees" *in the Health Management Division*.

We now turn to mother's first argument.

Under section 213.5, and as pertinent here, a juvenile court has the authority to issue an order "enjoining any person from molesting, . . . harassing, telephoning, including, but not limited to, making annoying telephone calls . . . , contacting, either directly or indirectly, . . . or disturbing the peace of [a dependent] child's current or former social worker."  (§ 213.5, subd. (a).)  For these purposes, one person "disturb[s] the peace" of another if she engages in ""conduct that destroy[s] the mental or emotional calm of the other party." [Citation.]'"  (*In re Bruno M.* (2018) 28 Cal.App.5th 990, 997 (*Bruno M.*), quoting *Perez v. Torres-Hernandez* (2016) 1 Cal.App.5th 389, 401.)  Whether we review the trial court's issuance of the injunction for an abuse of discretion or for substantial evidence (*In re E.F.* (2020) 45 Cal.App.5th 216, 222 (*E.F.*), review granted June 17, 2020, S260839 [abuse of discretion]; *In re L.W.* (2020) 44 Cal.App.5th 44, 51 (*L.W.*)), the question is the same:  Does the record, when viewed in the light most favorable to the ruling, support a finding that mother engaged in conduct that disturbed Misa's peace and that mother's conduct may continue?  (*E.F.*, at p. 222; *Bruno M.*, at pp. 996-997; *L.W.*, at p. 51.)

Substantial evidence supports the juvenile court's issuance

of the injunction in this case. Misa catalogued a long list of incidents in which mother was insulting, offensive, demeaning, rude, bellicose, and threatening. Having to endure such conduct is certainly enough to destroy a person's mental or emotional calm, and hence enough to disturb their peace. Misa confirmed as much, when she said that mother's conduct caused her emotional distress and prevented her from servicing other children. "[E]vidence that the restrained person has previously molested"—or, in this case, disturbed the peace—of the protected person "is certainly sufficient" to support issuance of injunctive relief under section 213.5. (*In re B.S.* (2009) 172 Cal.App.4th 183, 193; accord, *Cassandra B.*, *supra*, 125 Cal.App.4th at pp. 204-205, 212-213 [upholding issuance of injunction under section 213.5 when the mother was repeatedly calling and harassing the caregivers].) Given that mother still knows how to contact Misa (given the dozens, if not hundreds, of harassing calls in the past), given mother's penchant for lashing out at anyone around her, and given Misa's continuing relevance to S.F.'s case as a prior social worker on that case, a reasonable trier of fact could conclude that the danger of future outbursts against Misa and the Health Management Division is still present.

Mother raises what boil down to three arguments in response.

First, she argues that the Department has assigned mother a new social worker and that mother had not harassed the new social worker in the three weeks between the issuance of the TRO and the hearing on the injunction. Thus, mother argues, she will ostensibly "express[] her frustration" at the *new* social worker rather than at Misa and others in the Health Management Division. To the extent mother is arguing that an injunction can

10

never be issued to protect a *former* social worker, that argument is foreclosed by the plain language of section 213.5, which expressly provides for injunctive relief to protect "former social worker[s]." (§ 213.5, subd. (a).) To the extent mother is arguing that no injunction should issue against the former social worker *in this case*, substantial evidence supports its issuance in this case. Where, as here, a parent has unaddressed impulse control issues, a juvenile court may reasonably infer that the parent's prior conduct will continue. (*Bruno M.*, *supra*, 28 Cal.App.5th at p. 998 [juvenile court "'could reasonably infer, from the father's tendency to resort to violence as well as from his evident lack of impulse control, that he might be a threat to [the children's] safety'" in the future]; *In re B.S.*, *supra*, 172 Cal.App.4th at p. 194 [same].) Here, the court-appointed expert found that mother's behavior "suggests poor emotional control plus a sense of entitlement," and the record supports that finding—and the danger of further harassment that flows from it.

Second, mother contends that this case is analogous to *In re C.Q.* (2013) 219 Cal.App.4th 355 (*C.Q.*) and *In re N.L.* (2015) 236 Cal.App.4th 1460 (*N.L.*). It is not. In both *C.Q.* and *N.L.*, the appellate court overturned injunctions that prohibited a parent from contacting a child on the ground that no substantial evidence supported a finding that the parent had directed his or her conduct *toward the child* (as opposed to the child's caregiver). (*C.Q.*, at pp. 364-365; *N.L.*, at pp. 1465-1468.) Here, there is nearly overwhelming evidence that mother directed her conduct at Misa and the staff of the Health Management Division whom the injunction protects.

Lastly, mother asserts that the juvenile court's injunction does not satisfy the requirements for issuing injunctive relief

11

under section 340.5 or Code of Civil Procedure section 527.8. Because the requirements for relief under section 213.5 were met—and because the Department's request and the juvenile court's order were made on forms invoking section 213.5—we have no occasion to assess whether there are additional statutory grounds for upholding the injunction.  One is enough.

## DISPOSITION

The second sentence in paragraph 10 of the injunction is modified to read as follows:  "Restrained person must not contact, directly or indirectly, telephone or send messages, mail or email to DCFS personnel or employees in the Health Management Division except through her attorney of record."  As modified, the order of injunction is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.

HOFFSTADT


We concur:


_____, P. J.
LUI


_____, J.
ASHMANN-GERST

12