Filed: 8/15/22 In re Aniya E. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re ANIYA E., a Person Coming Under the Juvenile Court Law. | B312779 |
| | (Los Angeles County Super. Ct. No. DK17248A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>      Plaintiff,<br><br>      v.<br><br>AQUENDOLYN C.,<br><br>      Defendant and Appellant,<br><br>TALMADGE K.,<br><br>      Respondent. | |

APPEAL from an order of the Los Angeles County Superior Court, Kristen Byrdsong, Juvenile Court Referee. Affirmed.

Pamela Rae Tripp for Defendant and Appellant.

Shep Zebberman for Respondent.

No appearance for Plaintiff.

Aquendolyn C., the maternal grandmother of seven-year-old Aniya E., appeals the permanent restraining order issued by the juvenile court pursuant to Welfare and Institutions Code section 213.5 (section 213.5) prohibiting her from contacting or approaching Aniya or Talmadge K., Aniya's maternal grandfather and now-adoptive parent. Aquendolyn contends the order was not supported by substantial evidence. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

1. *The Dependency Proceedings*

The juvenile court in 2017 sustained a dependency petition pursuant to Welfare and Institutions Code section 300, subdivisions (a) and (b), and declared Aniya a dependent child of the court because of her father Jordan E.'s history of violent behavior toward Aniya's mother, Ambirre K. At the disposition hearing Aniya was released to Ambirre under the supervision of the Los Angeles County Department of Children and Family Services. Approximately eight months later, following Ambirre's death in January 2018, Aniya was placed with Aquendolyn. In March 2018, after being removed from Aquendolyn, Aniya was placed with Talmadge. (*In re A.E.* (June 16, 2020, B302982) [nonpub. opn.]; *Jordan E. v. Superior Court* (Nov. 19, 2019, B299395) [nonpub. opn.] (*Jordan E.*).)

On April 27, 2018 the court granted Talmadge's de facto parent request and denied Aquendolyn's request. (*In re A.E.*, *supra*, B302982.) In December 2019 the court terminated Jordan's parental rights, ordered adoption as the permanent plan for Aniya and identified Talmadge as Aniya's prospective adoptive parent. (*Ibid.*)

## 2. *The Application for Restraining Orders, the Temporary Restraining Orders and Aquendolyn's Declaration*

On March 8, 2021 Talmadge applied for restraining orders against Jordan and Aquendolyn seeking protection for Aniya and himself. Talmadge's supporting declaration stated the request was "due to intimidation and threats by both parties; Aquendolyn's harassment and history of fraud, deceit, and violation of Court Orders to gain unauthorized access to Aniya; and Jordan's history of violence and aggression." In particular, as it related to Aquendolyn, Talmadge declared that for eight months Aquendolyn had been leaving weekly voicemail messages from a private telephone number after Talmadge had blocked her number and despite his repeated requests not to call. Talmadge explained that Aquendolyn in her messages, which she claimed were for Aniya but which he believed were intended for him, "unloads about how much she is grieving Aniya's [m]other (and [their] child)" and "repeatedly states that Aniya is meant to be with [Aquendolyn], and only her." He further explained the messages, at two or three minutes each, were long and in them Aquendolyn also "goes on about how Aniya is suffering by being in [Talmadge's] care, and this is not what Ambirre wanted." The messages were "very upsetting" to Talmadge and made him "very worried for the emotional harm" Aquendolyn would "inflict on Aniya if given the opportunity."

Talmadge also described an incident in which the adoption worker had come to his home for a visit and Aquendolyn had emailed the worker immediately afterward to object to the adoption. The adoption worker, who had not contacted Aquendolyn, did not know how Aquendolyn had discovered the worker had been assigned to the case. Talmadge was disturbed that Aquendolyn somehow knew confidential information about

the adoption worker even though neither the worker nor he had provided it to her.

Talmadge asserted Aquendolyn "has shown that she is willing to go to great lengths to get what she wants," including the use of deception "to benefit financially from Aniya surviving Ambirre's death." He stated Aquendolyn hid Ambirre's illness and falsified a health care directive for Ambirre after her death; falsified documents to receive Social Security benefits due Aniya; and, claiming to be Aniya's guardian, filed a wrongful death lawsuit on Aniya's behalf with the assistance of attorney William Newkirk, whom she had deceived into believing she was Aniya's guardian.[1] Talmadge expressed fear Aquendolyn would continue to impersonate Aniya's guardian and to try to manipulate others into helping her cause harm to Aniya and him.

Noting Aquendolyn had deceived the Department, violated court orders and manipulated her monitors to gain unauthorized access to Aniya in the past, Talmadge stated he believed she had done so because, as her behavior had shown, she was obsessed with "taking Aniya back," regardless of the impact on the child. Aquendolyn, he stated, would not be deterred by any reasonable means and had admitted to him she would not stop. Finally, referring to Jordan's history of violence and aggression, including

[1] Talmadge attached to his declaration an email from Newkirk in which Newkirk stated, "Aquendolyn continues to pester us with phone calls to complain about what's going on in the adoption proceedings. . . . She's also asked why she can't be made as the 'backup' on [Aniya's] annuity, 'just in case something happens to Talma[d]ge.' I told her that she can't be involved in the proceeding because of the recent order . . . in which the court directed that she not participate any further in anything having to do with the action on An[i]ya's behalf against" the hospital.

toward Ambirre, Talmadge asserted Aquendolyn and Jordan had been "working in tandem" so that Jordan could obtain unauthorized access to Aniya.

The juvenile court issued temporary restraining orders against Aquendolyn and Jordan on March 10, 2021. Aquendolyn responded to the request for a restraining order on April 15, 2021. In her declaration Aquendolyn stated she called weekly for Aniya but Talmadge would not let her have a relationship with the child. Aquendolyn claimed she had no financial incentive for bringing the wrongful death lawsuit: Any funds obtained from that action would be deposited into an annuity for Aniya, who would be the only person to have access to them.

3. *The Hearing on the Application for a Restraining Order Against Aquendolyn*

At the two-day hearing on Talmadge's request for a restraining order against Aquendolyn, Talmadge testified he considered Aquendolyn dangerous and feared for Aniya's and his safety, noting at one point that Aquendolyn owned a gun. He explained he had known Aquendolyn for 35 years and no longer believed she was "sound minded." Aquendolyn's erratic behavior began after their daughter died and Aquendolyn lost custody of Aniya. Since then, Talmadge continued, he had observed a decline in Aquendolyn's emotional stability. He stated Aquendolyn had made threats, and he was concerned Aquendolyn would take Aniya and "become a flight risk." He believed Aquendolyn viewed him as an obstacle to becoming Aniya's caregiver and spoke of his death as a way to gain access

to Aniya. Talmadge confirmed everything in his March 3, 2021 declaration was accurate with one minor correction.[2]

The court admitted into evidence Newkirk's retainer agreement, signed by Aquendolyn, for the wrongful death action relating to Ambirre. The court observed the retainer agreement listed Aquendolyn as Aniya's guardian ad litem even though the court had ordered Aquendolyn not to have any contact with Aniya and had appointed Aniya's counsel as the child's guardian ad litem.

Talmadge had saved several of Aquendolyn's voicemail messages but had deleted other messages because he found them too disturbing. Three voicemail messages were played for the court. In them, Aquendolyn's statements included, "[T]here is nobody better to tell [Aniya] about her Mother than me"; and, "I'm just praying that [Ambirre's] soul is resting. Because I know her soul will really rest when you [Aniya] and I are reunited, and we can be together because that's what she wanted."

Aquendolyn testified she believed Aniya should be placed with her. She acknowledged signing the retainer agreement with Newkirk as Aniya's guardian ad litem even though that was not accurate, admitted contacting Talmadge on his cellphone in 2021 and continuing to call after he had asked her to stop, and requesting to serve as Talmadge's backup for Aniya's annuity after Aniya had been removed from her care. She also admitted having unmonitored visitation with Aniya during the time the court had ordered monitored visits.

---

[2]     Talmadge's correction to his declaration was not relevant to disposition of this appeal.

Aquendolyn conceded she had received monthly Social Security death benefits of $1,300 on behalf of Aniya for 11 or 12 months when Aniya was in Talmadge's care. Aquendolyn claimed she spent that amount every month on Aniya's behalf, primarily for clothing, food, furniture and activities for the child. Although Aquendolyn sent Talmadge toys and clothing, she admitted she did not send him money or furniture.

Following argument of counsel, the court on May 18, 2021 issued a five-year restraining order protecting Aniya and Talmadge from Aquendolyn.[3]

## DISCUSSION

1. *Governing Law and Standard of Review*

Section 213.5, subdivision (a), authorizes the juvenile court to issue an order after a dependency petition has been filed "enjoining a person from molesting, attacking, striking, stalking, threatening, . . . harassing, telephoning, . . . contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the child or any other child in the household." Under section 213.5 the court may also issue orders protecting "any parent, legal guardian, or current caretaker of the child." (§ 213.5, subd. (a).) At the hearing for the restraining order "[p]roof may be by the application and any attachments, additional declarations or documentary evidence, the contents of the juvenile court file, testimony, or any combination of these." (Cal. Rules of Court, rule 5.630(f)(1).)

---

[3]  On October 8, 2021, following finalization of Aniya's adoption, the juvenile court terminated its jurisdiction in the dependency case.

7

Welfare and Institutions Code section 213.5 provides that application for the restraining order is to be made "in the manner provided by Section 527 of the Code of Civil Procedure or in the manner provided by Section 6300 of the Family Code, if related to domestic violence."[4] (Welf. & Inst. Code, § 213.5, subd. (a).) This incorporation of Family Code section 6300, part of the Domestic Violence Prevention Act (DVPA) (Fam. Code, § 6200), was intended to permit the juvenile court to issue Welfare and Institutions Code section 213.5 restraining orders under the same standards provided for in the DVPA. (*Priscila N. v. Leonardo G.* (2017) 17 Cal.App.5th 1208, 1214; see Cal. Rules of Court, rule 5.630(c) ["[t]he definition of abuse in Family Code section 6203 applies to restraining orders issued under Welfare and Institutions Code section 213.5"].)

"'[A]ppellate courts apply the substantial evidence standard to determine whether sufficient facts supported the factual findings in support of a [section 213.5] restraining order and the abuse of discretion standard to determine whether the court properly issued the order.'" (*In re S.G.* (2021) 71 Cal.App.5th 654, 670; accord, *In re Carlos H.* (2016) 5 Cal.App.5th 861, 866.) "'[W]e view the evidence in a light most favorable to the respondent, and indulge all legitimate and reasonable inferences to uphold the juvenile court's determination. If there is substantial evidence supporting the order, the court's issuance of

---

[4] The application for restraining order protecting Talmadge and Aniya related to domestic violence. (See Fam. Code, § 6211, subds. (d) & (f) [defining "domestic violence" as abuse perpetrated against specified persons, including a "person with whom the respondent has had a child" or "[a]ny other person related by consanguinity or affinity within the second degree"].)

the restraining order may not be disturbed.'" (*In re Bruno M.* (2018) 28 Cal.App.5th 990, 996-997.) "It is not our function to second-guess [the juvenile court's] credibility determinations or weighing of the evidence." (*In re S.G.*, at p. 672; see *In re Eli B.* (2022) 73 Cal.App.5th 1061, 1072 ["[i]n reviewing the juvenile court's ruling we cannot reweigh the evidence or evaluate witness credibility"; "[w]e must uphold the juvenile court's factual determination as long as it is supported by substantial evidence '"even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence"'"].)

2. *Substantial Evidence Supports the Restraining Order Protecting Talmadge*

Aquendolyn contends there was insufficient evidence to support issuance of the restraining order protecting Talmadge. Relying on *In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1512, she argues the transcripts of the voicemail messages only show her love for Aniya and contain no language that "could reasonably result in serious harassment, alarming, tormenting or terrorizing" or "serious annoyance" of Talmadge.[5]

*In re Brittany K., supra*, 127 Cal.App.4th 1497, however, involved the term "stalking" as used in section 213.5. Like the parallel provisions in the DVPA, section 213.5 provides for much broader protection, specifically authorizing orders to prevent the restrained individual from disturbing the peace of the child or the child's caregiver seeking protection. (See *Burquet v. Brumbaugh* (2014) 223 Cal.App.4th 1140, 1144; *In re C.Q.* (2013) 219 Cal.App.4th 355, 363 ["[i]ssuance of a restraining order

---

[5]     Italics in the quoted excerpts have been omitted.

under section 213.5 does not require 'evidence that the restrained person has previously molested, attacked, struck, sexually assaulted, stalked, or battered'" the protected person].)

Under both the DVPA and section 213.5, "[a]nnoying and harassing an individual is protected in the same way as physical abuse," and "'protective orders can be issued because of persistent unwanted phone calls or letters.'" (*Perez v. Torres-Hernandez* (2016) 1 Cal.App.5th 389, 398-399 [characterizing as "incorrect under the DVPA" the trial court's determination "that '[a]buse is not merely simply annoying or harassing—occasional harassing phone calls intended to annoy the other person'"].) Under the DVPA, "'disturbing the peace of the other party' refers to conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party." (Fam. Code, § 6320, subd. (c); see, e.g., *In re Marriage of Evilsizor & Sweeney* (2015) 237 Cal.App.4th 1416, 1425 [disturbance of wife's peace by husband's conduct in "'disclosing or threatening to disclose to third parties for no particular reason intimate details of [their] lives'"]; *Burquet v. Brumbaugh*, *supra*, 223 Cal.App.4th at p. 1144 [defendant disturbed plaintiff's peace by contacting her by phone, email and text with messages containing inappropriate sexual innuendo, despite her repeated requests that he not contact her, and arriving at her residence uninvited and refusing to leave].)

At the hearing on the request for a permanent restraining order, Talmadge's attorney argued, in part, that Aquendolyn had harassed Talmadge and disturbed his peace. The juvenile court agreed, finding Aquendolyn's conduct was harassing and threatened Talmadge's emotional stability. Substantial evidence supported that finding. Aquendolyn's argument to the contrary, pointing to her statements of love for Aniya in the three

transcribed voicemail messages, disregards the wealth of evidence before the court of her troubling conduct directed to Talmadge. Indeed, even with respect to her voicemail messages, Aquendolyn ignores Talmadge's testimony that most of her messages had been deleted as "so disturbing" to him and his declaration that in those messages she "goes on about how Aniya is suffering by being in [Talmadge's] care."

Moreover, Talmadge testified Aquendolyn's persistent phone calls, which continued despite his repeated requests she cease doing so, and "too many threats to take lightly," caused him fear and concern. Nothing more was required to support the juvenile court's finding that a permanent restraining order was appropriately issued to protect Talmadge.[6] (See *In re Marriage of Fregoso & Hernandez* (2016) 5 Cal.App.5th 698, 703 ["[t]he testimony of one witness, even that of a party, may constitute substantial evidence"].)

### 3. *Substantial Evidence Supports the Restraining Order Protecting Aniya*

During the hearing the juvenile court commented that Aquendolyn's voicemail statements that Aniya's dead mother would only be happy knowing Aquendolyn was in contact with

---

[6] Although not raised in the juvenile court or addressed in Aquendolyn's appellate briefs, the five-year order granted by the juvenile court appears to violate section 213.5, subdivision (d)(1), which authorizes the court to grant a permanent restraining order that remains in effect "no more than three years, unless . . . extended by further order of the court on the motion of any party to the restraining order." Any issue regarding the appropriate duration of the restraining order should be presented in the first instance to the superior court.

Aniya were inappropriate, harassing and threatening "to the emotional well-being of the minor to hear these statements about what the mother would have wanted." Pointing to that comment by the court, Aquendolyn argues the restraining order as to Aniya was not supported by any evidence because the child never heard the messages.[7]

Aquendolyn's argument misperceives the record. The court's reference to "the emotional well-being of the minor to hear these statements" was to the likely impact should Aniya hear them and was focused on Aquendolyn's inability to adhere to court orders and directives—for example, to refrain from speaking to a child about case issues.[8] The court did not find that Aniya had heard the messages, nor did it need to.

That Aniya had not heard Aquendolyn's voicemail messages did not preclude an order protecting Aniya from Aquendolyn, whose conduct constituted "disturbing the peace" as defined in the DVPA, which includes "coercive control, which is a pattern of behavior that in purpose or effect unreasonably interferes with a person's free will and personal liberty." "Examples of coercive control include, but are not limited to, unreasonably . . . [¶] . . . [¶] . . . [c]ontrolling, regulating, or monitoring the other party's . . . finances [or] economic resources." (Fam. Code, § 6320, subd. (c)(3).) Similarly,

---

[7] Aquendolyn also contends sharing memories of Ambirre would be comforting to Aniya, not threatening or harassing.

[8] Specifically, the juvenile court, when discussing Aquendolyn's statements, stated that "all caregivers, everyone involved in the case, [were] always admonished to not discuss case issues." It also referred to Aquendolyn's continuing inability to follow the court's orders.

"molesting," another form of abuse under the DVPA (Fam. Code, §§ 6203, subd. (a)(4), 6320, subd. (a)), ""means to interfere with so as to injure or disturb; molestation is a willful injury inflicted upon another by interference with the user of rights as to person or property."" (*In re Cassandra B.* (2004) 125 Cal.App.4th 199, 212 [mother "molested" Cassandra by "attempting to gain entry to the home of Cassandra's caregivers without their knowledge, appearing at Cassandra's school and then following behind the caregiver's car after Cassandra was picked up from school, together with her threats to remove Cassandra from her caregivers' home"].)

In explaining its decision to grant the restraining order, the juvenile court expressly identified evidence falling within these categories of abuse, including Aquendolyn's unauthorized contact with Aniya and her falsification of Social Security documents and health care directives. That evidence amply supported an implied finding of Aquendolyn's unreasonable, coercive control over Aniya. As Talmadge's attorney pointed out at the hearing, additional evidence regarding those factors could be found in the Department's reports, which were before the juvenile court.

Because the reports were not included in the appellate record, Aquendolyn has not provided an adequate record to assess her contention that, apart from the transcribed voicemail messages, there was insufficient evidence to support the court's order. The issue has been forfeited. (See *Jameson v. Desta* (2018) 5 Cal.5th 594, 609 [""if the record is inadequate for meaningful review, the appellant defaults and the decision of the trial court should be affirmed""]; *Randall v. Mousseau* (2016) 2 Cal.App.5th 929, 935 ["[f]ailure to provide an adequate record

on an issue requires that the issue be resolved against appellant"].)

Citing *In re C.Q., supra,* 219 Cal.App.4th 355 and *In re N.L.* (2015) 236 Cal.App.4th 1460, Aquendolyn argues the restraining order as to Aniya should be reversed, regardless of the other evidence before the juvenile court, because, as in those two cases, there was insufficient evidence the child's safety would be in jeopardy absent inclusion in the order. As explained in *In re Bruno M., supra,* 28 Cal.App.5th at page 997, however, "[t]here need only be evidence that the restrained person 'disturbed the peace' of the protected child." Neither *In re C.Q.* nor *In re N.L.* considered whether the peace of the protected persons had been disturbed. In fact, in reversing the restraining order as to the children because of insufficient evidence relating to their safety, the court in *In re C.Q.* relied on *In re B.S.* (2009) 172 Cal.App.4th 183.[9] As explained in *In re Bruno*, "when *B.S.* was decided, 'disturbing the peace' was not one of the enjoinable acts listed in section 213.5. That language was not added to the statute until 2010, *after B.S.* was decided." (*In re Bruno*, at p. 999.)

Finally, relying in part on *San Diego County Dept. of Social Services v. Superior Court* (2005) 134 Cal.App.4th 761, 767, Aquendolyn contends the juvenile court committed reversible error when it failed to recognize the difference between a guardian ad litem appointed for Aniya for purposes of the wrongful death litigation and a guardian ad litem appointed under the Child Abuse Prevention and Treatment Act (CAPTA) (42 U.S.C. § 5101 et seq.) in dependency proceedings. (See *San*

---

[9]     See *In re C.Q., supra,* 219 Cal.App.4th at pages 363-364.

14

*Diego County Dept. of Social Services*, at p. 768 [concluding appointment of a guardian ad litem separate from a CAPTA guardian ad litem was "necessary to make decisions for the child in regard to investigating a possible tort action and initiating the action by filing a tort claim against the appropriate government entity under the California Tort Claims Act"].) Whatever misstatement the juvenile court may have made on this point, Aquendolyn admitted she was not Aniya's guardian ad litem when she signed the retainer agreement for the wrongful death action falsely stating otherwise. If error by the juvenile court, it was unquestionably harmless.

## DISPOSITION

The juvenile court's order is affirmed.

                                    PERLUSS, P.J.

We concur:

SEGAL, J.

WISE, J.*

---

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

15