Filed 9/20/23  In re L.V. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re L.V., Jr., a Person Coming Under the Juvenile Court Law. | B319841 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>L.V.,<br><br>      Defendant and Appellant. | (Los Angeles County Super. Ct. No. 21LJJP00507A) |

APPEAL from orders of the Superior Court of Los Angeles County.  Susan Ser, Judge.  Affirmed.

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

————————————————————

**INTRODUCTION**

L.V. (Father), the father of a dependent child, appeals from juvenile court's restraining order, enjoining him from contacting a social worker assigned to the case. Father also appeals from the court's dispositional order, removing the child from parental custody and denying Father's request to have the child placed with him. We conclude the evidence was sufficient to support the restraining order because Father engaged in conduct toward the social worker that is prohibited under Welfare and Institutions Code[1] section 213.5. We further conclude the evidence was sufficient to support the dispositional order because the juvenile court reasonably could find that placing the child with Father would be detrimental to his physical safety and well-being, and that removal from Father was the only reasonable means to protect the child from harm. We accordingly affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.     Dependency petition**

Father and M.M. (Mother) are the parents of L.V., Jr., (L.V.), a boy born in October 2021. At the time of L.V.'s birth, Father and Mother were in a dating relationship, but did not reside together. Mother had no prior criminal or dependency history. Father had a number of prior convictions for offenses that included assault, criminal threats, and marijuana possession. He had been identified as the father of another child in an open family maintenance case, but none of the allegations in that case involved him.

---

[1]     Unless otherwise stated, all further statutory references are to the Welfare and Institutions Code.

On October 10, 2021, the Los Angeles County Department of Children and Family Services (DCFS) received a referral alleging that Mother and L.V. had both tested positive for methamphetamines at the child's birth. In an interview with DCFS at the hospital, Mother stated she was shocked by the test results. According to Mother, she was not currently using any drugs. She last experimented with methamphetamines in 2018, and Father helped her to stop using the drug at that time. She believed the positive drug test was likely caused by eating tainted food from a food truck a few days before she gave birth. Mother planned to reside with L.V. in the maternal grandparents' home upon their release from the hospital. She reported Father had not visited L.V. in the hospital because he was a military veteran who suffered from posttraumatic stress disorder.

On October 11, 2021, DCFS attempted to meet with Father, but he refused to make himself available for an interview. He also had been uncooperative with DCFS in the other open dependency case. In a telephone call with DCFS, Father stated he wanted custody of L.V. He denied any history of drug use, and expressed shock that Mother and the baby had tested positive for methamphetamines.

Following L.V.'s discharge from the hospital, DCFS took the child into protective custody. On October 15, 2021, DCFS filed a dependency petition for L.V. under section 300, subdivision (b)(1). The petition alleged that Mother had a history of substance abuse and abused methamphetamines during her pregnancy, which caused L.V. to have a positive toxicology screen for the drug following his birth. The petition further alleged that Father knew or reasonably should have known of Mother's substance abuse, and failed to protect L.V. from the risk of harm.

3

At the October 21, 2021 detention hearing, Mother appeared via Webex and was appointed counsel. Father did not appear. The juvenile court detained L.V. from both parents at that time. On November 5, 2021, Father appeared for arraignment via Webex and was appointed counsel. At least 10 to 15 times during the hearing, Father attempted to unmute himself and to interrupt the court. When Father refused to cooperate despite the court's repeated admonishments, the court ejected him from the hearing. Father's counsel requested that L.V. be released to Father, or alternatively, the paternal grandmother. The court denied the request, and ordered DCFS to investigate potential relative placements with discretion to release L.V. to any appropriate relative pending adjudication of the petition. The court granted both parents monitored visitation.

## II.    Jurisdictional and dispositional report

As of the November 18, 2021 jurisdictional/dispositional report, L.V. was residing in a foster home. DCFS reported that the child was doing well in the care of his foster parents, and had begun monitored visits with Mother. In a November 2021 interview with DCFS, Mother denied using drugs during her pregnancy. She maintained that the positive drug test following L.V.'s birth was caused by tainted food purchased from a food truck. She stated that she and Father were good parents, and that the safest place for her child was at home with her.

DCFS made multiple attempts to interview Father for its report, but was unable to reach him. In a lengthy e-mail sent to the children's social worker Angela Stantorf (CSW Stantorf) on November 16, 2021, Father questioned why DCFS was trying to contact him, and stated that he did not have a case. He also

accused DCFS of unlawfully detaining L.V., asserting in part: " 'None of you people at DCFS has done the job properly! It's pretty sad that my child was taken from my baby's mother at 6 day's [sic] old when he was in no danger! The child must be in imminent danger to be removed the way he was! Your organization placed my child in more danger then [sic] we would ever do! Had anyone done their job you would know that [Mother] is the victim of a crime and all you people have done is victimized her even more! She doesn't know her rights or the law but guess what? I DO! . . . I'm coming for every last person on this case! If you knew anything about me you people would know that I know the law because I worked with them and the government for over 15yrs [sic] all I hear is that I'm this and I'm that, but only thin[g] I am is a pissed off father who [sic] child was taken illegally.' "

In the e-mail, Father denied Mother had any prior drug use, and claimed the positive drug test was caused by either the meal she ate from the food truck or the medication given to her at the hospital. He further stated: "I demand my child back and I'm not going to be treated like we're guilty of something when we're not! [L.V.] should have never been taken so all of this is voided! I will not conform nor perform for your little dog and pony show! I am not a criminal, molester, or druggie! Beyond being judged in a court of law you will be judged by the highest authority of them all . . . GOD! Everyone will have their day and when that day comes may he have mercy on your soul's [sic] because to put someone through this is pure EVIL!' "

In a series of supplemental reports filed prior to the adjudication hearing, DCFS noted that L.V. remained placed with his foster parents. Between December 2021 and

January 2022, Mother had four positive tests for methamphetamines, and failed to appear for a number of other drug tests.  In a January 2022 meeting with DCFS, Mother admitted to using drugs, and indicated that she planned to participate in a drug treatment program.  As of February 2022, Mother was attending an outpatient drug program.  She had tested negative for drugs in three consecutive tests, but was not consistently attending her individual program sessions.  She continued to have monitored visitation with L.V., and was attentive to the child during the visits.

Between December 2021 and March 2022, CSW Stantorf e-mailed Father on several occasions in an effort to set up his visits with L.V. and to provide referrals for services.  Father did not respond to any of these e-mails.  CSW Stantorf also tried to contact Father via text message.  On March 2, 2022, Father responded to CSW Stantorf in a lengthy text message, which began:  "I don't have a case with you!  Never have never will!  It's such a shame that you're just now messaging me after almost 5 month's [*sic*] of illegally having my child!  I don't live with [Mother] nor was I at the hospital!  Per the law and your own guidelines, my child should have never been taken!"  He denied any involvement in the other dependency case in which he had been identified as a father.  He also accused DCFS of kidnapping L.V. when it detained the child from Mother.

Father then asserted:  "You people fuked [*sic*] up bad!  I coming [*sic*] for everyone's job!  This is a level of incompetence that can't be measured!  No offense but I don't care who you are or how nice you've pretended to be to [Mother] or my child!  This is criminal what's been done!  There's a certain line that's established and once you cross it there's no 'I made a mistake' or

'I'm so sorry, I didn't know' fuk [*sic*] that!  People will be held accountable even this judge! . . . You all can think I've been blowing smoke and I'm a nobody all you want!  But you shall see 1st hand how much I love my child and how fuked [*sic*] up this has been and the pain and torment you've caused my family! I know it's not you exactly but you're collateral damage at this point because you did nothing to try and really help my child be where he should have been all along!  I'm sure [Mother] has given you the packet of evidence we comprised [*sic*] of all the infractions and violations of rights!  You should look through it!  Maybe you'll learn something about me!  Instead of following the rest of the sheep."

Father's text message continued:  "This is the only time I'm texting you!  So you can take your classes and whatever else you're trying to pull and stick it . . . I think you get the rest! I know the Law i [*sic*] worked in it for 10yrs [*sic*] of my life!  I'm not doing shit for you people to make me look like I actually have a case hahahah you're crazy!  Go ahead and run to the judge with this message just like you did with the email!  This doesn't make me need a psychiatric evaluation!  This means I'm fuking [*sic*] mad because my son was taken and I'm being violated and slandered left and right!  But never given the full paperwork to know what's really going on nor the opportunity to speak on [*sic*] court to show I'm not who you all are saying I am!  Really does suck it had to come this far!  But God always has a plan!  And everything happens when it's supposed to!  God Bless and GOODLUCK! [*sic*] You're going to need it!"

Father also sent photos to CSW Stantorf with his text message.  In one image, which appeared to be a self-photo taken in front of a mirror, Father was wearing a law enforcement badge

around his neck and a gun holstered at his waist. In another image, Father was wearing a skeleton-type mask over his face.

## III. Adjudication hearing

On March 8, 2022, the juvenile court held the adjudication hearing on the section 300 petition. The court sustained the allegations in the petition made against Mother based on her substance abuse, and dismissed the allegations made against Father. With respect to Father, the court stated that "[t]he father has not been entirely cooperative with the Department, but the court does not find that there is a preponderance of the evidence regarding his failure to protect."

Both parents requested that L.V. be immediately released to Father as a nonoffending parent. The court denied the request, finding that it would be detrimental for the child to be placed with Father at that time. The court continued the matter for a dispositional hearing, and ordered DCFS to assess releasing L.V. to the parents or the paternal grandmother.

## IV. Request for a restraining order

On March 8, 2022, the date of the adjudication hearing, DCFS filed a request for a restraining order against Father on behalf of CSW Stantorf under section 213.5. DCFS alleged that Father sent CSW Stantorf e-mail and text messages along with a photo, which caused her to feel threatened and to fear for her safety. DCFS further alleged that, during a call with CSW Stantorf, Father said "he had become numb to killing children as a result of his war experience overseas and PTSD," which also caused her to fear for her safety. At the adjudication hearing, the court granted a temporary restraining order against Father.

The hearing on DCFS's request for a permanent restraining order was held on March 29, 2022. Prior to the start

of the hearing, Father refused to comply with the court's request that he remove his hat while inside the courtroom. When the court ordered Father to either remove his hat or exit the courtroom, Father became angry at the court and the bailiff. The bailiff and a second deputy had to address Father outside the courtroom due to his disruptive behavior.

CSW Stantorf testified at the hearing. According to her testimony, she had been working as a children's social worker for DCFS for about two years. Her first contact with Father was in a November 2021 telephone call. During the call, Father said that he had been deployed multiple times and had become numb to having to kill children to protect the men in his unit. He did not make any specific threat at that time.

When CSW Stantorf later reached out to Father to discuss the case, he responded in the November 16, 2021 e-mail. Although Father did not make any direct threats of harm in the e-mail, CSW Stantorf feared for her safety based on his statement about God having mercy on their souls. It was her understanding that this statement typically was made when a person had died or was dying.

CSW Stantorf next had contact with Father in March 2022 when he replied to her text message. In his reply, Father did not threaten CSW Stantorf with physical harm. She feared for her safety, however, based on Father's statement calling her collateral damage. As a military veteran herself, CSW Stantorf understood this term to refer to an innocent civilian being injured or killed. She also felt threatened by the accompanying photo of Father with a holstered gun, although she acknowledged that Father also wore a badge and was not holding the weapon in the

photo.  Father's text message was CSW Stantorf's last contact with him.

As a DCFS social worker, CSW Stantorf had prior encounters with parents who were angry about their children being detained.  This was the first time that she sought a restraining order against a parent.  She testified that Father's statements and behavior had caused her substantial emotional distress.

Following this testimony, counsel for DCFS asked the court to grant a permanent restraining order against Father.  Citing sections 213.5 and 340.5, DCFS's counsel argued that Father made a threat of physical harm against CSW Stantorf and had the apparent ability to carry out that threat.  Father's counsel opposed the request, arguing that CSW Stantorf's testimony showed that Father never made a direct threat of harm. His counsel also argued that Father's statements about coming after the people involved in the case referred to pursuing available legal remedies, and not acts of violence.

The court granted the request for a restraining order. The court stated that, while Father may not have made a direct threat against CSW Stantorf, a reasonable person would consider his statements to her to be threats of physical violence.  The court also noted that Father's statements and behavior had caused CSW Stantorf to experience substantial emotional distress. In addition, the court found that Father's conduct toward CSW Stantorf constituted harassment, which as defined in Code of Civil Procedure section 527.6, includes a willful course of conduct directed at a specific person that alarms, annoys, or harasses the person, and that serves no legitimate purpose.

In issuing the restraining order, the court also considered Father's behavior at the hearing. The court stated: "Our bailiff made a simple request for the father to remove his hat. Father got very angry, at one point pointed to the court, and stated something to the court in an angry tone. I didn't catch what the father stated, but then he started approaching the bailiff very closely, I believe [in] a threatening manner. This was all in reaction to the bailiff asking the father to follow court rules."

The restraining order prohibited Father from having any contact with CSW Stantorf, and required him to stay at least 100 yards from her person, residence, and workplace for a period of three years.

## V. Dispositional hearing

Prior to the dispositional hearing, DCFS reported that it had attempted to assess the paternal grandmother and both parents for L.V.'s possible placement, and was recommending that the child not be released to them at that time. As to the paternal grandmother, she told DCFS she wanted to know the rules before having the child placed with her and did not want to make any changes to her home. While she indicated she was willing to have Mother and Father reside in her home, she asked that DCFS communicate with her directly because "[Mother] lies." She also stated Father was not currently living with her because she "can only take so much of [him]." Although the paternal grandmother agreed to a home assessment, no one answered the door when DCFS arrived at the scheduled time.

As to Mother, she informed DCFS that she again tested positive for methamphetamines in April 2022. Her counselor advised DCFS that Mother would be discharged from her drug treatment program if she had another positive or missed drug

11

test.  As to Father, DCFS reported that it had been unable to assess him for placement because he had not responded to any of the repeated attempts to reach him.  DCFS stated it was concerned that if Father refused to make himself available for an interview, he would not make L.V. available for monthly visits from the agency to assess the child's safety and well-being.  DCFS also expressed concern about Father's mental health given that he reportedly suffered from posttraumatic stress disorder, appeared to have unresolved anger issues, and had engaged in threatening and harassing conduct toward CSW Stantorf.  In addition, DCFS noted Father had not participated in any services, and had not visited L.V. since the child was detained.

On April 11, 2022, the juvenile court held the dispositional hearing.  Counsel for DCFS and counsel for L.V. joined in requesting the child be removed from both parents.  Mother's counsel asked the court to release L.V. to Mother on the condition that she reside with the paternal grandmother, or alternatively, to Father.  Father's counsel requested that the court release L.V. to Father as a nonoffending, noncustodial parent.

After hearing argument from counsel, the court declared L.V. a dependent of the court under section 300, subdivision (b).  The court removed L.V. from both parents, finding that the child would be in substantial danger if returned to parental custody, and that there were no other reasonable means of protecting L.V. from harm.  The court also denied Father's request that L.V. be released to him, finding that such placement would be detrimental to the child's safety, protection, or well-being.

In making its ruling, the court noted that it had made a prior finding of detriment at the March 8, 2022 adjudication hearing based on Father's conduct toward CSW Stantorf.

12

The court also noted that Father had to be removed from the courtroom at the March 29, 2022 restraining order hearing based on his hostile behavior toward the court and bailiff. The court then stated: "So the father, if he can't comply with a simple request by the court and our bailiff, the court has little confidence that [he] will cooperate with the department and comply with court orders. . . . [C]ompliance with the court and the department is essential for a release of a child to the father, since the department and the court [have] to ensure that the child will be safe. [¶] . . . So the . . . finding that the court made on March 8, 2022, that does remain. And the court has additional evidence to support that finding."

The court ordered monitored visitation and reunification services for both parents. Mother's case plan included a full drug and alcohol treatment program with aftercare and weekly drug testing, parenting education, and individual counseling. Father's case plan consisted of parenting education, individual counseling, and a psychiatric evaluation with follow-up treatment as recommended.

Father filed a timely appeal.

## DISCUSSION

On appeal, Father challenges the sufficiency of the evidence supporting the restraining order issued against him. Father also contends the evidence was insufficient to support the dispositional orders removing L.V. from his custody and denying his request that the child be placed with him.

### I. Restraining order

At the March 29, 2022 hearing, the juvenile court granted DCFS's request for a restraining order that enjoined Father from having any contact with CSW Stantorf for a three-year period.

13

On appeal, Father argues the juvenile court erred in issuing the restraining order because there was no evidence that he made any threats of physical harm to CSW Stantorf. We conclude Father's argument lacks merit.

### A. Governing law

Section 213.5 authorizes the issuance of a restraining order to protect a social worker in a pending dependency proceeding. It provides, in relevant part, that the juvenile court may "issue an ex parte order enjoining a person from molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, harassing, telephoning, . . . destroying the personal property, contacting, . . . coming within a specified distance of, or disturbing the peace of the child's current or former social worker." (§ 213.5, subd. (a).) "Issuance of a restraining order under section 213.5 does not require 'evidence that the restrained person has previously molested, attacked, struck, sexually assaulted, stalked, or battered' " the person to be protected. (*In re S.G.* (2021) 71 Cal.App.5th 654, 671.) "Nor does it require evidence of a reasonable apprehension of future abuse." (*In re C.Q.* (2013) 219 Cal.App.4th 355, 363.) Rather, "[t]here need only be evidence that the restrained person 'disturbed the peace' " of the protected person. (*In re Bruno M.* (2018) 28 Cal.App.5th 990, 997.) In this context, one person " 'disturb[s] the peace' " of another by engaging in " ' "conduct that destroys the mental or emotional calm of the other party." ' " (*Ibid.*)

Section 340.5 also permits the juvenile court to issue a restraining order to protect a social worker from the parents of a dependent child. It states that the juvenile court "may, for good cause shown and after an ex parte hearing, issue its order restraining the parents of the dependent child from threatening

14

the social worker, or any member of the social worker's family, with physical harm." (*Id.*, subd. (a).) Under the statute, " 'good cause' means at least one threat of physical harm to the social worker, or any member of the social worker's family, made by the person who is to be the subject of the restraining order, with the apparent ability to carry out the threat." (*Id.*, subd. (b).) To be entitled to relief under section 340.5, either the child welfare agency or the social worker "must show a threat arising from the social worker's performance of his or her assigned duties in providing services to a dependent child of the juvenile court." (*In re Matthew F.* (2005) 132 Cal.App.4th 883, 888.)

"[A]ppellate courts apply the substantial evidence standard to determine whether sufficient facts supported the factual findings in support of a restraining order and the abuse of discretion standard to determine whether the court properly issued the order." (*In re Carlos H.* (2016) 5 Cal.App.5th 861, 866; accord, *In re S.G.*, *supra*, 71 Cal.App.5th at p. 670; *In re A.M.* (2019) 37 Cal.App.5th 614, 619.) When the appellant challenges the sufficiency of the evidence supporting the juvenile court's factual findings, " 'we view the evidence in a light most favorable to the respondent, and indulge all legitimate and reasonable inferences to uphold the juvenile court's determination. If there is substantial evidence supporting the order, the court's issuance of the restraining order may not be disturbed.' " (*In re Bruno M.*, *supra*, 28 Cal.App.5th at pp. 996–997.)

B. **Substantial evidence supported the restraining order against Father**

Viewed in the light most favorable to the juvenile court's order, the evidence was sufficient to support a finding that Father engaged in conduct prohibited under section 213.5.

15

The record reflects that, during the course of the dependency case, Father sent CSW Stantorf two lengthy, vitriolic writings along with some concerning self-photos, which she perceived as threatening and caused her to fear for her physical safety.

In his first writing sent via e-mail, Father told CSW Stantorf, " 'I'm coming for every last person on this case!' " He also warned her, " 'Beyond being judged in a court of law you will be judged by the highest authority of them all . . . GOD! Everyone will have their day and when that day comes may he have mercy on your soul's [sic] because to put someone through this is pure EVIL!' " CSW Stantorf testified that, even though Father did not make any explicit threats of violence in his e-mail, she feared for her safety based on his statement about God having mercy on her soul because "[t]hat's usually a statement made when someone is dying or has died."

In his second writing sent via text, Father wrote, "[Y]ou shall see 1st hand how much I love my child and how fuked [sic] up this has been and the pain and torment you've caused my family! I know it's not you exactly but you're collateral damage at this point because you did nothing to try and really help my child be where he should have been all along." He also stated, "Really does suck it had to come this far! But God always has a plan! And everything happens when it's supposed to! God Bless and GOODLUCK [sic]! You're going to need it!" CSW Stantorf testified that Father's description of her as "collateral damage" also caused her to fear for her safety because, as a fellow military veteran, she understood the term to refer to a "civilian, an innocent party being injured or killed." In addition, Father chose to attach to this text message photos of himself wearing a gun holstered at his waist and a skeleton-type mask over his face.

16

Given this evidence, the juvenile court reasonably could find that Father " 'disturbed the peace' " under section 213.5 by engaging in " ' "conduct that destroy[ed] the mental or emotional calm" ' " of CSW Stantorf. (*In re Bruno M.*, *supra*, 28 Cal.App.5th at p. 997.) The court also reasonably could find that Father's conduct was "harassing" within the meaning of section 213.5. While section 213.5 does not define harassment, Code of Civil Procedure section 527.6, which authorizes civil restraining orders prohibiting harassment, provides a definition of the term. (See *In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1510 [courts may refer to other statutes "for purposes of obtaining a 'reasonable and practical' statutory construction" of terms used in section 213.5].) It defines "harassment" to include "a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose." (Code Civ. Proc., § 527.6, subd. (b)(3).) The conduct "must be that which would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress." (*Ibid*.) CSW Stantorf testified that Father's conduct did in fact cause her "substantial emotional distress." She further testified that she had prior experience with parents who were angry about their children being detained, but this was the first time that a parent's conduct caused her to seek a restraining order. CSW Stantorf's testimony therefore provided substantial evidence to support the issuance of a restraining order under section 213.5.

Citing section 340.5, Father contends the evidence was insufficient to support a restraining order because CSW Stantorf admitted in her testimony that Father never made any direct threats of physical harm to her. Unlike section 340.5, however,

17

section 213.5 does not require a showing that the person to be restrained made a prior threat of physical harm. Instead, "[i]t may be sufficient to show that the person to be restrained 'disturb[ed] the peace' of the petitioner (§ 213.5, subd. (a))." (*In re S.G.*, *supra*, 71 Cal.App.5th at p. 671.) Although counsel for DCFS relied on section 340.5 in arguing that a restraining order was warranted, she also noted that section "213.5 does allow the court to enjoin such conduct" to "protect the social worker in this case." Moreover, both DCFS's request and the juvenile court's order were made on Judicial Council forms that specifically referenced section 213.5. In any event, the juvenile court reasonably could have inferred that Father's statements to CSW Stantorf, along with the photos he sent of himself wearing a holstered gun and a mask, constituted an implied threat of physical harm under section 340.5.

In deciding to grant the restraining order, the juvenile court also could have drawn a reasonable inference that Father's conduct toward CSW Stantorf was likely to continue given the hostility and lack of impulse control that he displayed at the hearing on the restraining order. (See *In re Bruno M.*, *supra*, 28 Cal.App.5th at p. 998 [restraining order proper where juvenile court reasonably could infer from parent's " 'tendency to resort to violence as well as from his evident lack of impulse control, that he might be a threat to [the protected person's] safety' "].) As described by the court, Father refused to comply with a simple decorum request that he remove his hat inside the courtroom. Instead, Father responded to the court in an "angry tone" and approached the bailiff in a "threatening manner," ultimately resulting in his removal from the hearing.

Father argues that his conduct was that of a parent who was angry about his child being detained. He also asserts that his statements to CSW Stantorf showed he was taking certain measures to contact her superiors, but was not threatening acts of violence. At the hearing on the restraining order, the juvenile court was able to review the entirety of Father's e-mail and text messages to CSW Stantorf and to hear her testimony about the extent of her contact with Father. Based on such evidence, the court found that a reasonable person would consider Father's statements to CSW Stantorf to be threats of physical harm, and that his statements and conduct actually caused CSW Stantorf substantial emotional distress. It is not the role of the appellate court to reweigh the evidence or second-guess the juvenile court's credibility determinations. (*In re S.G.*, *supra*, 71 Cal.App.5th at p. 672.) Rather, " 'we must indulge all reasonable inferences to support the decision of the juvenile court and will not disturb its findings where there is substantial evidence to support them.' " (*In re Carlos H.*, *supra*, 5 Cal.App.5th at p. 866.) Because there was substantial evidence supporting the restraining order, the juvenile court did not abuse its discretion in issuing it.

## II. Dispositional order

At the April 11, 2022 dispositional hearing, the juvenile court removed L.V. from the custody of both Mother and Father, denied Father's request to have the child placed with him, and ordered the parents to participate in reunification services. On appeal, Father asserts the evidence was insufficient to support these orders because there was no evidence that L.V. ever suffered or was at risk of suffering serious physical harm in Father's custody. We conclude this claim also fails.

19

### A. Governing law

Section 361, subdivision (d), governs the removal of a child from a noncustodial parent. It provides that "[a] dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child did not reside at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence that there would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child for the parent . . . to live with the child or otherwise exercise the parent's . . . right to physical custody, and there are no reasonable means by which the child's physical and emotional health can be protected without removing the child from the child's parent's . . . physical custody." (§ 361, subd. (d).)

In determining whether to remove a child from parental custody, "the juvenile court may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re D.B.* (2018) 26 Cal.App.5th 320, 332.) The court "must also consider whether there are any reasonable protective measures and services that can be implemented to prevent the child's removal from the parent's physical custody." (*Ibid.*) "A removal order is proper if it is based on proof of (1) parental inability to provide proper care for the minor and (2) potential detriment to the minor if he or she remains with the parent. [Citation.] The parent need not be dangerous and the minor need not have been harmed before removal is appropriate. The focus of the statute is on averting harm to the child." *(In re T.W.* (2013) 214 Cal.App.4th 1154, 1163; accord, *In re D.B.*, at p. 328.)

Section 361.2 governs the placement of a child following removal from parental custody. It states, in relevant part, that

20

"[i]f a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child.  If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child."  (§ 361.2, subd. (a).)

Section 361.2 "evinces the legislative preference for placement with the noncustodial parent when safe for the child." (*In re Patrick S.* (2013) 218 Cal.App.4th 1254, 1262.)  Thus, "[i]t requires placement with a noncustodial, nonoffending parent who requests custody 'unless the placement would be detrimental to the child.' "  (*In re C.M.* (2014) 232 Cal.App.4th 1394, 1401.) In making a finding of detriment, the juvenile court "weighs all relevant factors to determine if the child will suffer net harm." (*In re A.C.* (2020) 54 Cal.App.5th 38, 43.)  The burden is on the party opposing placement with a nonoffending parent "to show by clear and convincing evidence that the child will be harmed if the nonoffending parent is given custody."  (*In re C.M.*, at p. 1402.)

Although the language of section 361, subdivision (d), is not identical to section 361.2, it is substantively similar.  (Compare § 361, subd. (d) [placement with noncustodial parent would create "substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child"] with § 361.2, subd. (a) [placement with noncustodial parent would be "detrimental to the safety, protection, or physical or emotional well-being of the child"].)  Moreover, under both statutes, the standard of proof is clear and convincing evidence.  (*In re S.F.*

21

(2023) 91 Cal.App.5th 696, 720 [applying § 361, subd. (d)]; *In re C.M.*, *supra*, 232 Cal.App.4th at p. 1401 [applying § 361.2].) Accordingly, in most cases in which a court finds a "substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child" (§ 361, subd. (d)) in a parent's custody, it will also find "that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child" (§ 361.2, subd. (a)). (See *In re S.F.*, at p. 720, fn. 14 [any error in applying § 361.2 instead of § 361, subd. (d), would have been harmless given the statutes' similar standards]; *In re A.A.* (2012) 203 Cal.App.4th 597, 610 ["[i]t is illogical to require a court to consider placing a child with a noncustodial parent who has already been determined to pose a substantial danger"].)

An appellate court reviews challenges to the sufficiency of the evidence supporting dispositional orders for substantial evidence. (*In re I.J.* (2013) 56 Cal.4th 766, 773.) " ' "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*Ibid*.) "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.)

"The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or orders." (*In re E.E.* (2020) 49 Cal.App.5th 195, 206.)

## B. Substantial evidence supported the juvenile court's dispositional order

Based on the totality of the record in this case, the evidence was sufficient to support the juvenile court's findings that placing L.V. with Father would pose a substantial danger to the child, and would be detrimental to his physical safety and well-being. The evidence was also sufficient to support the court's finding that there were no reasonable means to protect L.V. from the risk of harm without removing him from Father's custody.

While the juvenile court dismissed the failure-to-protect allegations made against Father in the section 300 petition, the court reasonably could have found that, as of the dispositional hearing, Father did not appreciate the substantial risk of harm that Mother's ongoing substance abuse posed to L.V. In her initial interview with DCFS, Mother admitted that she used methamphetamines in 2018, and that Father helped her to stop using the drug at that time. However, in an October 11, 2021 telephone call with DCFS, Father expressed shock that Mother had tested positive for methamphetamines. Then, in his November 16, 2021 e-mail to CSW Stantorf, Father denied that Mother had any prior drug use. He also repeated Mother's implausible claim that her positive drug test at the time of L.V.'s birth had been caused by tainted food that she bought from a food truck. Further, on the two occasions that Father responded to CSW Stantorf's multiple attempts to reach him, he questioned why she was attempting to contact him at all and insisted that he did not have a case with DCFS. Thus, despite being a

23

nonoffending parent as of the dispositional hearing, Father continued to display a serious lack of insight into the issues that led to L.V. becoming a dependent of the court.

The juvenile court also reasonably could have found that placing L.V. with Father at the time of the dispositional hearing would be detrimental to the child's safety and well-being because Father had no relationship with L.V. An " 'alleged lack of a relationship between [a] father and [a child] is not, by itself, sufficient to support a finding of detriment.' " (*In re Adam H.* (2019) 43 Cal.App.5th 27, 33.) It is, however, a permissible factor that may be considered in assessing whether placement with a noncustodial parent would be detrimental to a child. (*In re A.C.*, *supra*, 54 Cal.App.5th at p. 43; *In re C.M.*, *supra*, 232 Cal.App.4th at p. 1402.) In this case, L.V. was detained by DCFS shortly after his discharge from the hospital, and the dispositional hearing was held six months later. Father did not visit L.V. in the hospital. Nor did Father make any effort to visit the child at any time over the course of the dependency proceedings. Rather, when CSW Stantorf repeatedly tried to contact Father to set up a visitation schedule, his only response was to send her the messages and photos that would form the basis for the restraining order against him. Given L.V.'s young age, Father's complete lack of contact with the child, and Father's denial of Mother's clear substance abuse issues, there was sufficient evidence to support a finding that L.V. would be at risk of harm if placed in Father's custody.

An order removing a child from parental custody also requires a showing that removal is the only reasonable means of protecting the child from the risk of harm. (§ 361, subds. (c)(1), (d).) Here, the evidence was sufficient to support a finding that

24

there were no reasonable means of protecting L.V. absent removal from Father. Prior to the dispositional hearing, Father requested that L.V. either be released to his custody, or placed with him on the condition that he reside in the paternal grandmother's home. The court accordingly ordered DCFS to assess both Father and the paternal grandmother for L.V.'s possible placement. Father refused, however, to make himself available for an in-person or telephone interview despite DCFS's repeated attempts to reach him. Due to Father's refusal to cooperate, DCFS also did not know where L.V. would be residing if the child were released to Father under in-home supervision. Although Father previously had identified his home address as the paternal grandmother's residence, she told DCFS that Father was not currently living in her home because she "can only take so much of [him]." In addition, when DCFS attempted to conduct a scheduled safety assessment of the paternal grandmother's home, no one answered the door. The juvenile court therefore reasonably could infer that placing L.V. with Father subject to DCFS supervision was not a sufficient alternative means of protecting the child from the risk of harm.

In challenging the sufficiency of the evidence supporting the removal order, Father contends the juvenile court improperly based its detriment finding on his lack of cooperation with DCFS, his statements to CSW Stantorf which caused her to seek the restraining order, and his reaction in the courtroom when he was ordered to remove his hat. Although the court mentioned these specific facts in making the detriment finding, it also stated it had "additional evidence to support that finding." Moreover, the court could consider these facts in issuing the removal order because they supported a reasonable inference that Father would

not cooperate with DCFS if L.V. were placed in his care, and thus, there were no reasonable means of protecting the child short of removal. (See *In re E.E.*, *supra*, 49 Cal.App.5th at p. 217 [removal order supported by substantial evidence where, among other facts, parents "did not cooperate with the social worker or engage meaningfully in services when [social services agency] became involved with their family," and instead "were emphatically resistant to the agency's investigation"].)

It is true, as Father asserts, that "[t]he inability of a parent to get along with a social worker is not evidence to support a removal order." (*In re Emily L.* (2021) 73 Cal.App.5th 1, 16.) This is not a case, however, where the only evidence offered in support of removal was the parent's lack of cooperation with DCFS. Rather, as discussed, the evidence supporting the court's findings in this case included Father's denial of Mother's drug abuse and the risk of harm it posed to their infant child, and his lack of any relationship with L.V. and failure to visit the child at any time during the dependency proceedings. On this record, the juvenile court's order removing L.V. from Father's custody and denying Father's request to have the child placed with him was supported by substantial evidence.

Lastly, Father argues that the portion of the dispositional order requiring him to participate in reunification services must be reversed because he was a nonoffending parent and there was no evidence supporting the order removing L.V. from his custody. As discussed, however, the evidence was sufficient to support the removal order. Moreover, when fashioning a dispositional order, the juvenile court may make "all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child." (§ 362, subd. (a).) The court is not limited to the content

26

of the sustained petition, and may consider the evidence as a whole to determine what orders would be in the child's best interests.  (*In re Briana V.* (2015) 236 Cal.App.4th 297, 311.) The court's determination will not be reversed " 'absent a clear abuse of discretion.' " (*In re Corrine W.* (2009) 45 Cal.4th 522, 532.)

Here, the juvenile court reasonably could conclude that ordering Father to participate in parenting education, individual counseling, and a psychiatric evaluation would best serve L.V.'s interests.  At the time of the dispositional hearing, Father had never visited L.V., or had any contact with his child.  Father also displayed a lack of insight into the issues that had led to DCFS's involvement with the family and filing of the section 300 petition.  In addition, Father engaged in harassing conduct toward CSW Stantorf, and acted in a hostile manner toward the court and its bailiff when asked to follow courtroom decorum.  Accordingly, the juvenile court did not abuse its discretion in ordering Father to participate in reunification services.

### DISPOSITION

The juvenile court's restraining order and dispositional order are affirmed.

VIRAMONTES, J.

WE CONCUR:

STRATTON, P. J.

WILEY, J.

27