Filed 10/10/18 Certified for Publication 11/2/18 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Bruno M. et al., Persons Coming Under the Juvenile Court Law. | B287537 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | Los Angeles County Super. Ct. No. 17CCJP00197A–B |
| Plaintiff and Respondent, | |
| v. | |
| PEDRO M., | |
| Defendant and Appellant; | |
| BRUNO M. et al., Minors, etc., | |
| Objectors and Respondents. | |

APPEAL from orders of the Superior Court of Los Angeles County, Robert S. Wada, Juvenile Court Referee. Affirmed.

Christopher R. Booth, under appointment by the Court of Appeal, for Defendant and Appellant.

Patricia K. Saucier, under appointment by the Court of Appeal, for Objectors and Respondents.

No appearance for Plaintiff and Respondent.

## INTRODUCTION

Pedro M. (father) appeals from the juvenile court's jurisdictional findings and dispositional orders declaring his children dependents of the court and detaining them from his custody. Among other orders, the court issued a permanent restraining order that restricted father from contact with Evelyn S. (mother) and the two minor children. Father's sole contention on appeal is that the portion of the order protecting the children was not supported by substantial evidence because the children were "never in the line of fire" when he beat mother. We conclude the children were indeed at risk of physical harm and, in any event, father's lengthy history of domestic violence against mother and the parents' frequent reconciliations justify the minors' inclusion in the restraining order. We therefore affirm.

## FACTUAL BACKGROUND

The family in this case consists of mother, father, Bruno M. (born 2011), and Allison M. (born 2015).

### 1. History of Abuse

Father and mother met in 2009 and moved in together the following year. Father would go on to hit and push mother about three times a month for the rest of their relationship. Over the

years, father inflicted bruises, scratches, split lips, and body pain. Sometimes he choked mother—causing her to vomit or lose consciousness. Father broke mother's glasses at least three times. He punched and kicked a door and the furniture, leaving holes that a social worker later observed. Father was also jealous, controlled mother's money, and isolated her from her friends. For the most part, mother stayed quiet about the abuse, and though she would leave father for weeks at a time, he always convinced her to come back.

Sometime in 2010, father beat mother for the first time by choking her and kicking her leg.[1] A hospital examination confirmed her account: mother was diagnosed with a "soft tissue contusion to the neck area." Father was arrested and eventually convicted of inflicting corporal injury on a spouse/cohabitant. He was placed on probation and ordered to serve 26 days in jail and complete a 52-week domestic violence program. The court also issued a three-year criminal protective order.[2] Nevertheless, when father was released from jail, he "sweet-talked" mother into taking him back.

Bruno was born in 2011, and in 2013, when Bruno was two years old, father hit mother again.[3] Though mother left father for

[1] According to the police report from this incident, there was also unreported domestic violence in 2009, but the 2010 incident was the first one mother recounted to social workers.

[2] Father claimed that while he knew there was a temporary restraining order in place, he was never served with a permanent restraining order.

[3] It appears mother also reported father to authorities in 2012, but the City Attorney declined to pursue the case.

three months to live with the maternal grandmother, father eventually convinced her to return.

On May 22, 2017, father hit and pushed mother. When mother tried to leave, father called the police—and when they arrived, father said mother had threatened to kill him. Mother denied making such a threat, but admitted wanting to hurt father because she was tired of his abuse. She had three partially-healed cuts on her chin and small bruises on her left leg. Though mother explained that she had been trying to defend herself, she was committed, at father's request, on a 36-hour psychiatric hold for suicidal ideation and wanting to hurt father.

In early August 2017, mother told father she had had enough. Father left. For a little while, he called only to speak to the children, so when he came to the house to see the children on August 13, 2017, mother let him in to use the restroom. Once inside, however, father began calling mother a whore in front of Bruno and Allison. When mother asked him to calm down, he threatened to take the children away. He told mother she was crazy. He told her he could kill her by hitting her. Then father grabbed mother by the neck, pushed her towards the bed, and broke her glasses. Allison covered her ears and Bruno watched. As father choked her, mother managed to free herself by kicking him. Finally, he left. Mother did not call the police. She was afraid of traumatizing the children—and afraid that father would take Bruno and Allison away if she reported him to authorities.

Father came to pick the children up again on August 20, 2017. A half-hour later, he returned, accusing mother of wanting to see other people. When mother went outside to get the children from the car, father called her a whore, then shoved her to the sidewalk. Then, as mother was taking Allison out of her car seat,

father grabbed mother, hit her on the chin with an unknown object, and pushed her to the ground a second time. During the incident, father appeared to be so focused on mother that he "forgot the children were present." He told mother, " 'If I wanted to, I could kill you,' " and threatened, " 'The day I see you with another man, I'll kill you or I'll do something that I might regret.' " Eventually, mother was able to bring the children inside—but father continued to bang on the door. Mother sustained bruises to her legs, which the social worker observed along with a photo of mother's bloody chin.

A few days later, mother reported the incident to the police, who contacted the Los Angeles Department of Children and Family Services (Department). The police report confirmed mother's version of events. Father was charged with corporal injury to a spouse/cohabitant (Pen. Code, § 273.5, subd. (a); count 1); battery of a spouse/cohabitant (Pen. Code, § 243, subd. (e)(1); count 2); and child endangerment (Pen. Code, § 273a, subd. (b); count 3). Yet father failed to appear in criminal court, and by the time the jurisdiction/disposition hearing was held in this case, a bench warrant had been issued for his arrest.

## 2.    Impact on Bruno

Bruno was just five years old when the family came to the Department's attention—and he worried a lot about mother. For example, when mother regained consciousness after one of the choking incidents, she found Bruno next to her. He said, " 'I thought you were dead, Mommy.' " Bruno once asked mother, " 'Why didn't you make my daddy happy so he won't hit you?' " And after the August 20, 2017, incident, Bruno told his maternal grandmother, " 'Daddy hit and pushed Mommy and Mommy

5

pushed him with her leg.' " Bruno told the social worker that he felt "scared" when his parents fought.

The violence impacted Bruno in other ways as well. Bruno told mother, " 'If you don't let me play with my toys, I'll hit you like my dad.' " Sometimes he was aggressive with mother and did hit her. Bruno also mimicked hitting Allison the way he had seen father hit mother.

When the social worker asked Bruno how his parents got along, Bruno replied, " 'Sometimes they fight each other. Daddy hits Mommy. He pushes Mommy into the couch, bed, and things where there is clothes.' " He also reported that he had seen father kick mother and heard someone kick the door. As for the August 20, 2017, incident, Bruno said, " 'Daddy hits Mommy. He pushed her on the bed and the couch and Mommy cried.' "

### 3.    Father's Statement

When the Department interviewed father, he agreed that he and mother had a history of violent altercations. He stressed, however, that though he had been arrested for domestic violence in the past, it was before Bruno and Allison were born. After the arrest, he had taken anger management classes and had learned to leave a situation when there was conflict—and while father acknowledged that he insulted mother during arguments in the children's presence, he claimed mother insulted him as well.

Father admitted pushing mother onto the bed during the August 13, 2017, incident—but denied choking her and denied that the children saw him push her. He explained that mother was hitting him as he tried to leave the house. Father admitted telling mother he could kill her by hitting her but denied it was a threat. Similarly, father admitted that mother fell while he was handing Allison to her during the August 20, 2017, incident but

6

denied that he had pushed mother or caused her to fall. Finally, father admitted that the children were present on some of these occasions and that Bruno had yelled, " 'Stop, Daddy!' "

After father's meeting with the social worker, father called mother and told her the social worker had advised them to fix things between themselves and not to obtain a restraining order. Father warned mother that if she didn't go along with this plan, he would say bad things about her.

## PROCEDURAL BACKGROUND

On September 5, 2017, the Department filed an application to remove Bruno and Allison from father and place them in mother's care. The court granted the application that day. Meanwhile, mother obtained a temporary restraining order in family court protecting her and the children from father. Mother needed father's address to serve him with a copy, but father refused to provide it. So, when the social worker called father to notify him of the upcoming detention hearing, the social worker also told him about the restraining order. Father asked the social worker if it would be possible, in the future, "for him to have his family back, including being with mother."

On September 11, 2017, the Department filed a dependency petition on behalf of both children alleging substantial risk of serious physical harm and failure to protect. (Welf. & Inst. Code,[4] § 300, subds. (a), (b)(1).) At the initial detention hearing on September 12, 2017, the court found the Department had made a prima facie showing that the children were people described by

---

[4] All undesignated statutory references are to the Welfare and Institutions Code.

section 300, detained the children from father, and released them to mother's custody with monitored visitation for father. At mother's request, the court also issued a temporary restraining order protecting mother, Bruno, and Allison from father. The order required father to stay 100 yards away from mother and the children and to have no contact with them except during court-ordered visitation. Father objected to the inclusion of the children in the order.

At the jurisdictional hearing on October 31, 2017, the court sustained the allegations in the section 300 petition and found father's domestic violence and mother's failure to protect the children from it warranted dependency jurisdiction. The court then proceeded to the dispositional hearing, and declared Bruno and Allison dependents of the court. The court removed the children from father and ordered reunification services and three 3-hour monitored visits per week. The court placed the children with mother and ordered family maintenance services.

Finally, over father's objection, the court issued a three-year permanent restraining order under section 213.5, subdivision (a), protecting mother and the children from father except for peaceful contact related to monitored visitation. The court found that "the children are, in fact, scared of father and father had threatened at one time to take the children. I think with that being the case, the children clearly—the court feels that the children are in danger."

Father filed a timely notice of appeal, and we appointed counsel to represent him. On April 27, 2018, father filed an opening brief in which he challenged the court's decision to include the children as protected parties in the permanent restraining order. On May 29, 2018, the Department notified us

that because it had taken no position on the matter below, it would not be filing a respondent's brief. On June 11, 2018, we appointed counsel to represent Bruno and Allison, and on July 9, 2018, counsel for minors filed a respondent's brief asking us to affirm the court's restraining order in its entirety. Mother is not a party to this appeal.

## DISCUSSION

Father contends there is no substantial evidence to support the portion of the permanent restraining order protecting the children. He does not challenge the portions of the restraining order naming mother as a protected person and requiring him to stay away from the family home where mother and the children live.

### 1.    Legal Principles and Standard of Review

Under section 213.5, subdivision (a), after "a petition has been filed … to declare a child a dependent child of the juvenile court, and until the time that the petition is dismissed or dependency is terminated," a juvenile court may issue an order "enjoining any person from molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, harassing, telephoning, … destroying the personal property, contacting, … or disturbing the peace of the child … ." The subdivision also permits the court to issue orders including the child's parent as a person protected from the behaviors listed above.

In reviewing the issuance of a restraining order under this section, "we view the evidence in a light most favorable to the respondent, and indulge all legitimate and reasonable inferences to uphold the juvenile court's determination. If there is substantial evidence supporting the order, the court's issuance of

9

the restraining order may not be disturbed." (*In re Cassandra B.* (2004) 125 Cal.App.4th 199, 210–211; *In re B.S.* (2009) 172 Cal.App.4th 183, 193 (*B.S.*).)[5]

## 2.  Substantial evidence supports the court's order.

Father insists there was no substantial evidence to support inclusion of the children in the restraining order because he "was never aggressive with the children, and [they] were never in the line of fire" of his assaults on mother. Similarly, he argues that while "the children may have been present during domestic violence between mother and father, … they were *never* involved in the melee." We disagree.

As a preliminary matter, we note that while evidence the restrained person has previously stalked, attacked, or inflicted physical harm on the protected child "is certainly sufficient" to justify issuance of a restraining order under section 213.5, issuance of a restraining order does not *require* such evidence. (*B.S.*, *supra*, 172 Cal.App.4th at p. 193; *In re C.Q.* (2013) 219 Cal.App.4th 355, 363 (*C.Q.*).) Nor does it require evidence of a reasonable apprehension of future physical abuse. (*Ibid*.) There need only be evidence that the restrained person "disturbed the peace" of the protected child.

In this context, *disturbing the peace* means " 'conduct that destroys the mental or emotional calm of the other party.' [Citation.]" (*Perez v. Torres-Hernandez* (2016) 1 Cal.App.5th 389,

---

[5] In *Brittany K.*, the appellate court reviewed the lower court's factual conclusions for substantial evidence and reviewed its decision, on those facts, to impose the restraining order for abuse of discretion. (*In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1512.) Our conclusion here would be the same under that standard of review.

10

401.) Plainly, there was substantial evidence that father "disturbed the peace" of Bruno and Allison. Father hit mother when Bruno was two years old, and continued to abuse her three times a month thereafter. Five-year-old Bruno and two-year-old Allison were frequently present to witness the abuse. Bruno reported that the attacks scared him—a point the court stressed below. He yelled at his father to stop. Allison covered her ears. At one point, Bruno thought his unconscious mother was dead.

Furthermore, evidence the children *were* "in the line of fire" provided a further basis on which the court could reasonably conclude father had disturbed their peace. Father admitted that the children had been present for some of the violence. For example, on August 20, 2017, father hit mother in the face and pushed her to the ground *while* she was removing Allison from her car seat. Given that father was so focused on mother that he would "forget the children were present," Allison could easily have been hurt.

And while the children had not *yet* been hurt during these altercations, the court could properly consider the extent and violence of father's attacks on mother when issuing the order. That is, the juvenile court "could reasonably infer, from the father's tendency to resort to violence as well as from his evident lack of impulse control, that he might be a threat to [the children's] safety. Such a threat could arise, even in the mother's absence, if the father got angry with another adult or with [the children]. Even assuming an opposite inference might be equally reasonable, we are not authorized to second-guess the juvenile court on this point." (*B.S.*, *supra*, 172 Cal.App.4th at p. 194; see also *Perez v. Torres-Hernandez*, *supra*, 1 Cal.App.5th at pp. 402–403 (conc. opn. of Streeter, J.) [addressing social science research

11

linking spousal abuse and child abuse].) In addition, the court could reasonably infer that the restraining order was necessary to protect Bruno and Allison from both mother's tendency to return to father despite the issuance of a protective order and father's threat to abscond with the children—a threat the court below found credible.

Nor are we persuaded by father's reliance on *C.Q.*, which he contends is "nearly identical" to this case "in every relevant respect." *C.Q.* concerned two incidents of domestic violence—both of which involved father hitting mother in the arm. (*C.Q.*, *supra*, 219 Cal.App.4th at pp. 358–359.) The couple had four children—ages 11, 12, 16, and 19. One of the children witnessed the second arm-hitting incident; none had witnessed the first. (*Id.* at pp. 357–358.) There had not been any other domestic violence in the relationship, and the children were not afraid of their father. (*Id.* at pp. 358, 364.) Here, on the other hand, father had been beating mother three times a month for 10 years—frequently in front of Bruno and Allison. Five-year-old Bruno and two-year-old Allison were much younger and less able to protect themselves or report any abuse than the children in *C.Q.*, and the violence Bruno and Allison witnessed was more severe. While the father in *C.Q.* hit the mother in the arm, in this case, father choked mother into unconsciousness, split her lip, and broke the furniture. As such, we are not persuaded that *C.Q.* is "nearly identical" to this case.

Similarly, father points to the two sentences *C.Q.* spends distinguishing *B.S.* to support the proposition that evidence of physical abuse is required to sustain a restraining order under section 213.5. (See *C.Q.*, *supra*, 219 Cal.App.4th at p. 365, distinguishing *B.S.*, *supra*, 172 Cal.App.4th at p. 194.) We do not

read *B.S.* so narrowly. Though the infant in *B.S.* was indeed in physical jeopardy, that case was premised on father's general inability to control himself during violent outbursts—of which throwing the mother onto the child was but one example. (*B.S.*, at p. 194.) The court also emphasized that father had committed repeated acts of domestic violence, and that "[d]uring previous incidents, he had torn a door off its hinges and knocked a hole in the wall." (*Ibid*.) The court explicitly held that physical harm, though sufficient, was not required. (*Id.* at p. 193.)

Moreover, when *B.S.* was decided, "disturbing the peace" was not one of the enjoinable acts listed in section 213.5. That language was not added to the statute until 2010, *after B.S.* was decided but well before the conduct at issue here. (Stats. 2010, ch. 572, § 25.) Thus, even if *B.S.* could be read to require that the child be placed in actual physical jeopardy—and we don't think it can—that limitation plainly does not apply after the statute's amendment.

Accordingly, we conclude substantial evidence supports the court's order.

## DISPOSITION

The dispositional orders are affirmed.


                                        LAVIN, Acting P. J.

WE CONCUR:



EGERTON, J.



DHANIDINA, J.

14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Bruno M. et al., Persons Coming Under the Juvenile Court Law. | B287537 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. PEDRO M., Defendant and Appellant; BRUNO M. et al., Minors, etc., Objectors and Respondents. | Los Angeles County Super. Ct. No. 17CCJP00197A–B **Order Certifying Opinion for Publication** |

Non-party Family Violence Appellate Project and 12 other non-parties have requested that our opinion in the above-entitled matter, filed October 10, 2018, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c).

The opinion is ordered published in the Official Reports.

LAVIN, Acting P. J.                                DHANIDINA, J.


EGERTON, J. did not participate in the decision to grant publication.

2