Filed 12/1/22  In re Jordan S. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re JORDAN S. et al., Persons Coming Under the Juvenile Court Law. | B314448 (Los Angeles County Super. Ct. No. 20CCJP05267A-D) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. THEODORE S., Defendant and Appellant. | |

APPEAL from the order of the Superior Court of Los Angeles County, Lisa A. Brackelmanns, Judge Pro Tempore. Affirmed.

Lori Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

* * * * * *

The juvenile court entered a three-year restraining order enjoining the father in a pending dependency case from contacting one of the social workers assigned to his case. Father appeals that order. Because the order is supported by substantial evidence, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I. Facts

Theodore S. (father) and Nanci C. (mother) have four children—Jordan S. (born 2012), Aiden S. (born 2013), Cameron S. (born 2015), and Christian S. (born 2017).

Father has a history of violence. In 2004, father was convicted of battery. In 2018, mother left father due to the domestic violence he committed against her; father spent the ensuing "years" harassing and intimidating mother, her new boyfriend, and the maternal grandmother. Over Labor Day weekend in 2020, when the children were visiting with father, father struck Jordan with a wire and belt; he struck Aiden with a wire, belt, and toy train tracks; he struck Cameron with a belt,

2

hangers, and toy train tracks; and he struck Christian with a belt. The blows he inflicted on Jordan and Aiden left bruises. He also told the children that "he wanted to kill [mother's boyfriend]."

Father denies striking the children, claiming instead that mother has coached them to lie.

## II. Procedural Background

### A. *Initial assertion of dependency jurisdiction*

On October 5, 2020, the Los Angeles Department of Children and Family Services (the Department) filed a petition asking the juvenile court to exert dependency jurisdiction over all four children on the grounds that father's acts of "physical abuse" were "excessive" and placed each child "at risk of serious physical harm," thereby rendering dependency jurisdiction appropriate under subdivisions (a), (b) and (j) of Welfare and Institutions Code section 300.[1]

### B. *Visitation*

Within days of the Department's filing, the juvenile court reaffirmed its previous emergency removal of the children from father by detaining the children; the court provided that father could have monitored visitation.

The Department assigned case worker Pamela Deboer (Deboer) as the lead case worker on the case.

Deboer monitored father's visit with the children on October 28, 2020. Prior to the children's arrival, Deboer and father spoke; because father spoke "rapidly" and seemed unable to focus on the impending visit with the children, Deboer had some concern that father might have been under the influence.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

Father told Deboer that "others were out to get him." When father started to video record part of his visit with the children in violation of the rules and Deboer asked him to put his phone away, father told Deboer in a "forceful[]" and "loud voice" that he was "their father" and could "do whatever" he wants. Although Deboer "felt threatened" by father's "tone of voice," she projected a "calm" demeanor to avoid escalating the encounter.

The next day, Deboer called father to set up a drug test. Father responded in a loud and angry voice, and repeatedly talked over Deboer during the conversation. He complained that she was "bullying" him.

During a visit on November 3, 2020, overseen by a monitor other than Deboer, father complained to the monitor that it was "[d]egrading" to "have someone watching you [during the monitored visits] like you are a criminal." "When this is over," father told her, "I am going to [w]ring someone's neck."

In late November 2020, Deboer called father regarding upcoming visitation dates with the children. Father became "irate," and complained that mother was unfairly dictating the dates of visitation. Father then pivoted his anger toward Deboer, and spoke in a "harsh," "loud," and "hostil[e]" tone. He demanded to know, "Are you taking drugs[? Y]ou are not listening to me." He also accused Deboer of doing social work "for the money." Deboer maintained a "calm" demeanor, so as not to "further aggravate" father.

In mid-December 2020, father called the Department to complain about Deboer, because he felt she was not "cooperating with him."

In mid-February 2021, father called Deboer. While "irate," he told Deboer he was not getting enough visitation time with the children.

### C.    *Jurisdiction and dispositional hearing*

On March 24, 2021, the juvenile court held the jurisdictional and dispositional hearing. The court sustained all of the petition's allegations against father. The court then removed the children from father's custody, placed them in mother's custody, and ordered the Department to provide mother with family maintenance services and father with enhancement services. As part of the enhancement services, the court ordered father to complete a case plan consisting of a parenting program, anger management classes, and individual counseling.

### D.    *Father's further interaction with Deboer*

On April 12, 2021, Deboer traveled to the Department's Lancaster office, which was nearer to father's residence, to give him information on the programs he needed to complete as part of his case plan. She arranged to meet him in the parking lot of the Department's office because she knew the Department's security officers would be nearby in case father once again became irate. Father was combative with Deboer during their conversation; he spoke loudly, repeatedly interrupted her, and then directly accused Deboer of interfering with his visits and "making it impossible for him to see his children." When father refused to discuss the case plan—the ostensible purpose for the meeting—Deboer decided to end the meeting by asking the security officer inside the office for assistance. Upon hearing that Deboer was going to contact the officer, father retorted, "You want security[?] I will get it for you"; father started "knock[ing] loudly on the glass doors" of the Department's office; and when

the security officer opened the door, father told the officer that *he* "need[ed] help because [Deboer was] not allowing [him] to see [his] children." Father then turned on his heel and walked away. Father's willingness to be aggressive with the Department's security officer left Deboer "shaking inside." Deboer remained with the security officer until father drove away.

### E. *Restraining order proceedings*

On May 7, 2021, the Department asked the juvenile court to enter a temporary restraining order (TRO) to protect Deboer from father. The court issued a TRO after finding "clear and convincing evidence," based on Deboer's declaration recounting her interactions with father, that father's conduct amounted to "civil harassment" and that "the only way to prevent this from reoccurring is to grant" the TRO.

After several continuances, the court on July 30, 2021, held a hearing on whether to issue a three-year restraining order. Father offered no evidence, and argued that a restraining order was unwarranted because father never explicitly threatened Deboer with violence. The court granted a three-year restraining order in light of father's "criminal convictions for assaultive behavior" and his "escalating behavior" with Deboer, which was capped off when "the security officer [in Lancaster] had to help father leave the premises" due to father's conduct. The restraining order prohibits father from contacting DeBoer, requires him to stay away from her, and lasts until July 30, 2024.

### F. *Appeal*

Father filed this timely appeal of the restraining order.

## DISCUSSION

Father argues that the juvenile court erred in issuing the restraining order protecting Deboer. Although the trial court did

6

not specify a statutory basis for its order, the parties agree that the most pertinent statute is section 213.5. Under section 213.5, and as pertinent here, a juvenile court has the authority to issue an order "enjoining a person from molesting, . . . harassing, telephoning, including, but not limited to, making annoying telephone calls . . ., contacting, either directly or indirectly, . . . or disturbing the peace of [a dependent] child's current or former social worker." (§ 213.5, subd. (a).) For these purposes, one person "'disturb[s] the peace'" of another if he engages in "'"conduct that destroys the mental or emotional calm of the other party."'" (*In re Bruno M.* (2018) 28 Cal.App.5th 990, 997 (*Bruno M.*), quoting *Perez v. Torres-Hernandez* (2016) 1 Cal.App.5th 389, 401.) To obtain a restraining order under section 213.5, the applicant need not show a prior infliction of physical harm or a reasonable apprehension of future physical abuse. (*Bruno M.*, at p. 997; *In re B.S.* (2009) 172 Cal.App.4th 183, 193-194 (*B.S.*).) Instead, it is "sufficient" if there is "evidence that the restrained person has previously molested"—or, in this case—disturbed the peace of—the protected person. (*B.S.*, at p. 193.) Whether we review the juvenile court's issuance of the restraining order for an abuse of discretion or for substantial evidence (*In re N.L.* (2015) 236 Cal.App.4th 1460, 1465-1466), the question is the same: Does the record, when viewed in the light most favorable to the ruling, support a finding that father engaged in conduct that disturbed Deboer's peace? (*Bruno M.*, at pp. 996-997; *In re L.W.* (2020) 44 Cal.App.5th 44, 51.)

Substantial evidence supports the juvenile court's finding that father engaged in conduct that destroyed Deboer's mental or emotional calm. Viewed in the light most favorable to the court's order, the evidence shows that, over the course of his interactions

7

with Deboers, father came to believe that *Deboers* was "making it impossible" for him to see his children and that her oversight was "degrading." He was becoming increasingly "irate" and "hostile" with her as a result. Indeed, father even confided to one of the monitors that he was ready to "[w]ring someone's neck." What is more, the evidence shows that father's simmering temper had boiled over into violence in the past—he was convicted of battery in 2004, he committed domestic violence against mother in 2018, and the juvenile court sustained the allegations—allegations that father does not contest on appeal—that father beat his own children with a belt and wire and other objects in 2020. Not surprisingly, father's escalating agitation with Deboers, when viewed in the context of father's history of violence, caused Deboers to feel "threatened" and to be "shaking inside," and hence disturbed her mental and emotional calm. (Accord, *Bruno M.*, *supra*, 28 Cal.App.5th at p. 998 [restraining order appropriate where parent's "tendency to resort to violence as well as . . . evident lack of impulse control" posed a "threat" to the protected person's "safety"].)

Father resists this conclusion with what boils down to three arguments.

First, father argues that Deboers repeatedly reaffirmed that she remained calm during her interactions with father; thus, he reasons, her calm was not disturbed. Father confuses *being* calm with *acting* calm. Deboers *acted* calm to avoid lighting the proverbial match that would ignite father's powder keg temper into an explosion of violence; but Deboers consistently indicated that she was *not actually calm* and, to the contrary, was frightened and "shaking [on the] inside." (*Curcio v. Pels* (2020)

8

47 Cal.App.5th 1, 12 [reasonable fear for safety constitutes disturbing the peace].)

Second, father argues that Deboer's fear was not *objectively* reasonable because father never explicitly said what he would do if Deboers did not increase his visitation; maybe all he would do, father now argues, is report Deboer to her supervisor. Relatedly, father argues that Deboer just needs to have "thicker skin" because social workers as a group are "assigned to work with parents . . . who are often hostile" and "angry," and who have "criminal histories" and "substance use addictions"; father was just another one of those "angry, hostile, loud, upset parent[s]" who are, in father's view, just par for the course in a social worker's job. Father's claim that the result of his threat was, at most, a sternly worded complaint to DeBoer's supervisor is belied by his statement that he wanted to "[w]ring the neck" of the people who were interfering with his relationship with his children and by his history of resorting to physical violence, both of which make Deboer's fear quite reasonable. What is more, we reject father's argument that the fact that dependency proceedings can be difficult on parents and family members of the dependent children somehow grants parents and family members the right to engage in civil harassment with impunity.

Third, father complains that the juvenile court got the record wrong when it said that the security officer at the Department's Lancaster office "had to help father leave the premises" because, in reality, father left on his own. This complaint is irrelevant, because our analysis of the record—which properly accounts for the security officer's role—shows substantial evidence to support the restraining order.

**DISPOSITION**

The order is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.
HOFFSTADT

We concur:


_____, Acting P. J.
CHAVEZ


_____, J.*
BENKE

---

*     Retired Associate Justice of the Court of Appeal, Fourth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.