Filed 3/25/24  In re E.F. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re E.F. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E081078 |
| Plaintiff and Respondent, | (Super. Ct. No. SWJ2200144) |
| v. | OPINION |
| K.F., | |
| Defendant and Respondent. | |
| T.F., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Michael J. Rushton, Judge.  Affirmed.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant.

1

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Respondent.

Minh C. Tran, County Counsel, Teresa K.B. Beecham, and Catherine E. Rupp, Deputy County Counsel, for Plaintiff and Respondent.

I.

INTRODUCTION

Appellant T.F. (Father) appeals the juvenile dependency court's sua sponte permanent restraining order (PRO) against Father, protecting respondent K.J.F. (Mother) and their four adopted children:  E.F. (age 14), K.F. (age 13), J.F. (age 12), and A.F. (age 10) (collectively, the children).  Father contends the PRO, issued on March 29, 2023, was an abuse of discretion because there was insufficient evidence to support it.  Father therefore requests this court to dismiss the PRO or, at a minimum, dismiss it as to the children.  The County and Mother urge this court to affirm the PRO.  We conclude substantial evidence supports the PRO and affirm it as to both Mother and the children.

II.

FACTS AND PROCEDURAL BACKGROUND

In September 2021, Los Angeles County Department of Children and Family Services (DCFS) filed a Welfare and Institutions Code section 300[1] petition alleging that Father's mental health and the parents' history of domestic violence placed the children

---

[1]  Unless otherwise noted, all statutory references are to the Welfare and Institutions Code.

2

at risk of harm. The petition alleged that on July 27, 2021, Father "brandished a gun at . . . [M]other, while the children were in the family home," and that his "mental and emotional problems," including "suicidal ideation, . . . endanger[ed] the children's physical health and safety." The petition further alleged that Mother had failed to protect the children from Father.

DCFS reported in the detention report that after the gun brandishing incident in July 2021, Father stayed with A.R. and G.R. for 10 days. He was asked to leave because the couple wanted to adopt a child, Mother and Father had been in the process of adopting when the gun incident occurred. In August 2021, the couple received disturbing emails and texts from Father, and on one occasion, he followed A.R. to the market. Fearing Father's erratic, frightening behavior, A.R. filed a police report and informed DCFS that she would be requesting a restraining order against Father.

DCFS reported in an addendum report that it did not detain the children from Mother, and recommended that the children remain in her care. DCFS also recommended that the juvenile court detain the children from Father and allow him to have monitored visitation.

A. *Detention Hearing*

At the September 14, 2021, detention hearing, the juvenile court ordered continued placement of the children with Mother and detention of the children from Father. The court also ordered monitored visitation for Father two times a week, for two hours a visit.

3

B.  *Jurisdiction and Disposition Proceedings*

On November, 1, 2021, the court granted Mother's request for a temporary restraining order against Father and continued the jurisdiction and disposition hearing to January 21, 2022.

DCFS reported in the October 2021 jurisdiction and disposition report that the parents were married but separated.  DCFS recommended that the court order family maintenance services for Mother and the children, and enhancement services for Father.  In an October 27, 2021, last minute information report, DCFS reported that both parents were participating in services and the children were attending therapy.  DCFS recommended monitored visits for Father, and liberalized visitation at DCFS's discretion.

DCFS stated in a last-minute information report, filed on December 2, 2021, that Mother would be requesting a stay-away order against Father, and that Mother re-located to Riverside.  DCFS, therefore, recommended transferring the case to Riverside.  DCFS also reported that the children were participating in therapy.  On January 14, 2022, DCFS filed another last-minute information report, stating that during monitored visits, Father tended to talk about money, the marriage dissolution, and the courts in the presence of the children.  DCFS warned Father about his passive-aggressive and sarcastic behavior.  DCFS filed another last-minute information report in January 2022, stating that Father's brother, Kyle, told DCFS that, while residing with Mother, he observed Mother place her hand over J.F.'s mouth to stop him from screaming, causing J.F. to become very upset.  Kyle also saw Mother force J.F. to take a cold bath because he refused to take a daily

4

nighttime bath. Kyle said he moved out of Mother's home, and sent Father and his other siblings an email on January 11, 2022, stating that he had left Mother and had given up trying to help the children.

DCFS also reported there was an emergency response referral in which it was reported that during a monitored visit between Father and the children, E.F. told Mother that Kyle pulled down his pants and showed his buttocks to the children. E.F. said she did not remember when the incident happened. Several other calls to the police were made, including calls regarding possible domestic violence between Mother and Kyle.

At the January 21, 2022, jurisdiction and disposition hearing, the juvenile court sustained the section 300 petition, amending it by interlineation, including striking the petition allegation that Mother failed to protect the children from Father. The court ordered that the children remain with Mother, the children be removed from Father, both parents receive services, and Father have monitored visitation twice a week, for two hours a visit.

Father appealed the January 21, 2022, jurisdiction and disposition orders on the ground DCFS failed to comply fully with the inquiry and notice requirements imposed by the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.) and related California law. The Court of Appeal, Second District, Division One, dismissed the appeal as moot because ICWA does not apply when a dependent child is removed from one parent and placed with another. (*In re E.F.* (Aug. 31, 2023, B323174) [non.pub. opn.].)

On March 21, 2022, the case was ordered transferred from Los Angeles County to Riverside County because Mother and the children relocated to Riverside County, and the transfer was accepted by the Riverside County Superior Court.

C. *July 22, 2022, Review Hearing*

On July 11, 2022, the Riverside County Department of Public Social Services (DPSS) reported in its section 364 family maintenance review report that the children were living with Mother, the parents were still married but separated, and Father was living with his girlfriend. Father reported he was on leave from his employment as a police officer at the police department, and might retire early for mental health reasons, if approved. Father said he was doing okay mentally and physically, and continued to take psychotropic medication. E.F., K.F., J.F., and A.F. were receiving therapeutic behavioral services (TBS) and counseling, were diagnosed with PTSD and ADHD, and were taking medication.

Father's family enhancement case plan filed on January 21, 2022, included individual counseling for Father "to address parenting, controlling relationships and high conflict relationships; mental health counseling to include a psychiatric medication evaluation and take prescribed psychotropic medications; and conjoint counseling with the children when deemed appropriate and recommended by individual therapist." Father began participating in weekly therapy in August 2021, and in March 2022, began attending therapy biweekly. His therapist reported that Father had potential disorders

which included "Anxiety, PTSD, Depression an[d] possible Adjustment Disorder or Bipolar Disorder."

DPSS reported that Father's monitored visits with the children in April and May 2022 went well. In May, DPSS liberalized Father's visitation to unsupervised visits for two hours a week. Father reported he would like to continue to liberalize visitation and gain 50/50 custody of the children.

At the hearing on July 22, 2022, the juvenile court ordered DPSS to admonish and confirm Father did not have firearms in his possession when he visited the children. DPSS was also ordered to confirm Father was not in possession of any firearms, which he stated were held by the police department. The court ordered that DPSS not liberalize Father's visitation to include overnights, weekends, or family maintenance without a court order. The court ordered Father to complete a psychological evaluation and set a contested section 364 family maintenance review hearing on August 15, 2022.

D. *August 15, 2022, Review Hearing*

On August 9, 2022, DPSS filed an addendum report confirming that Father had not completed a court-ordered psychological evaluation and that the police department had possession of his firearms. The Inglewood Police Department confirmed that Father was currently on leave and under investigation and that the police department had possession of five of his handguns and one semi-automatic rifle.

During the August 15, 2022, review hearing, Mother told the court she was not requesting a restraining order against Father because visits were going well and she did

not feel she needed a restraining order. The court stated that there did not appear to be any basis for limiting Father's visitation and authorized DPSS to allow Father placed on family maintenance, with liberalized unsupervised visitation, conditional upon Father not owning or possessing any firearms where the children were located. The court ordered Father to complete a psychological evaluation. The court also ordered DPSS to investigate allegations by one of the children of abuse against Kyle, and prohibited the children from having contact with him.

E. *February 14, 2023, Review Hearing*

On February 1, 2023, DPSS filed a status review report, which provided the following summary of Father's activity involving Mother and the children since August 2022.

On August 18, 2022, Father became angry with the children during an unmonitored visit and texted Mother to pick up the children early. When Mother arrived, Father threw the children's food at her car and yelled at her. The children were very upset, and said Father had yelled at them for lying, when they had not been lying. J.F. tried to leave and walk home but Father pulled him back by his shirt. The children told Mother that Father "was saying the F word a lot."

On September 7, 2022, Mother provided DPSS with a text from Father accusing her of "poison[ing] the children against him."

In October 2022, Father requested overnight visits. Mother told DPSS she was not comfortable with Father's request for overnight visits unless the court ordered a mental

8

health evaluation for Father, and his girlfriend was not present during the visits. Father and his girlfriend married in November 2022.

Mother notified DPSS on November 25, 2022, that K.F. and A.F. did not want to visit Father, and Father told her she needed to force the children to visit him.

On November 30, 2022, Mother reported that Father told her he would be relinquishing his parental rights.

On December 1, 2022, Mother provided DPSS with a screenshot of Father's text to the children that he did not want to be their dad anymore and that he was requesting to terminate his rights.

The following day, Mother asked about Father's visitation and was told it was court-ordered and she should encourage the children to participate in visitation with Father. She said she did but it was difficult because the children did not like his new wife.

On December 4, 2022, Mother texted DPSS stating the children did not want to see Father and that J.F. had a very intense nightmare.

The children reported that their last visit with Father was on December 24, 2022, and they did not want to continue to visit him.

On January 12, 2023, Father emailed DPSS, stating that he wished to relinquish his parental rights, and asked "if there's anything I need to do or sign."

On January 25, 2023, the children again told DPSS that they did not want to continue visiting Father.

9

DPSS concluded in its February 1, 2023, status review report that Mother had successfully complied with her case plan and had made progress. The children were doing well with Mother, and Father had requested to have his parental rights relinquished. DPSS recommended dependency of the children be terminated, with juvenile custody orders granting Mother sole physical and legal custody.

During the status review hearing on February 14, 2023, Father waived his appearance but submitted a letter, in which he wrote that the letter was intended to explain to the court why Mother "is an unfit [M]other and a liar," and that he intended to "petition the court to remedy the situation." In his letter, Father made numerous derogatory, accusatory statements about Mother, blaming her for the children's emotional and behavioral instability. Father said he was currently on administrative leave and that Mother's false accusations against him and filing a domestic violence restraining order against him jeopardized his career as a police officer. Father included a copy of a January 2022 email from Kyle to Father and his brother, John, also maligning Mother.

During the February 14, 2023, status review hearing, the court found that Father had five firearms registered to him and all his guns were accounted for as of August 2022. The court ordered DPSS to check with the Inglewood Police Department and file an addendum report addressing whether the police department was still in possession of Father's firearms, whether he was still employed by the police department, and steps he would have to take to get his firearms back. Father agreed with DPSS's recommendation to close the case, with sole physical and legal custody awarded to Mother.

10

The court noted there was no active restraining order against Father. The court said it was concerned about closing the case without verifying that Father's guns were currently accounted for and not in his possession. The court ordered another CLETS[2] check on Father's guns, noting that Father's AR-15 did not show up in CLETS. Mother told the court that the temporary restraining order (TRO) issued on September 14, 2021, expired and it was not renewed in November 2021, because Father requested that it not be renewed because of his job.

The court asked during the hearing if Mother feared Father. Mother said she did not and was comfortable closing the case without a restraining order. Minors' counsel also said he was comfortable with closing the case without a restraining order because Father had remarried, had not made any threats to Mother or the children recently, and had sent the children a text that he did not want to be their father anymore. He had not seen them since Christmas in 2022. DPSS merely submitted on the matter.

The court stated that it was unaware of any reason why, without a restraining order, the Inglewood Police Department would be prevented from giving Father back his guns, because he had not been convicted of a crime preventing him from possessing them. Mother responded that she believed the police department was processing Father's medical retirement request, in which case he would not have access to guns anymore because of his mental health. The court ordered the hearing continued and ordered DPSS to ask the Inglewood Police Department: "A) Are they still in possession of [F]ather's

---

[2] CLETS is a commonly used abbreviation for "California Law Enforcement Telecommunications System."

11

firearms; B) Is [F]ather still employed, or whatever they're willing to share of the status of his employment . . . ; and the third point would be the steps father would have to take to get his guns back or the likelihood of his getting his guns back." The court also ordered DPSS to interview Mother and Father regarding the issue of the firearms and the need for a restraining order. The court continued the contested section 364 family maintenance status review hearing to March 14, 2023.

F. *March 14, 2023, Review Hearing*

On March 8, 2023, the DPSS filed an addendum report, stating that on February 28, 2023, Inglewood Police Department Sergeant De La Torre reported that Father was still employed by the Inglewood Police Department, which still was in possession of Father's firearms. Sergeant De La Torre added that Father was currently under investigation.

On March 8, 2023, Mother told DPSS that on March 5, 2022, Father was on a section 5150 hold because he overdosed on Seroquel and, after waking up from a coma, threatened to kill police officers. He was then placed on a 5250 hold for one month. Mother believed that the 5250 hold would prevent Father from becoming a police officer again and from getting his firearms back from the Inglewood Police Department.

When DPSS contacted Father on March 8, 2023, Father told DPSS that the police department had his firearms, and then said, "'Why are you asking me about the firearms? Why aren't you doing your job in keeping the kids safe? The problem is that Kyle is still around the kids and you have not done your job to protect them and keep them safe.

12

Kyle has an active restraining order.'"  DPSS told Father that was what it was doing, and Father said, "'You can contact my police department and you're a f---ing loser,'" and hung up the phone.

DPSS then called back Mother regarding Kyle's arrest for domestic violence involving Mother.  Mother confirmed he was arrested for domestic violence.  The incident was in March 2022, when Kyle took a hammer from one of the boys.  When he raised it in the air, Mother got flashbacks from when Father slammed a hammer on her desk.  Mother screamed, "'Don't hit me with the hammer,'" and the police were called.  Mother said the charges against Kyle were dropped and he was released.  The children had not communicated with him after the court told them there was a restraining order against him.

At the family maintenance review hearing on March 14, 2023, neither of the parties requested a restraining order.  Nevertheless, the juvenile court on its own motion issued a TRO protecting Mother and the children from Father.  The court noted that in the Los Angeles Superior Court, two restraining order requests were filed but not issued, one in dependency court and one in family law court.  According to Mother, the restraining orders were not issued because doing so would impact Father's occupation as a police officer.  The court noted that when the case was transferred to Riverside, there was no request for a restraining order against Father, but the court was extremely concerned about the status of Father's numerous firearms.  The court therefore issued a TRO sua sponte, explaining:  "[F]rom the very beginning the [F]ather has demonstrated great

13

mental and emotional instability. The one thing that is not in dispute is he pointed the gun at his own head in the presence of family members. What also does not seem to be in dispute, except by [F]ather – he admitted to holding the gun on himself. He just didn't admit to also pointing it at the [M]other. The [M]other indicated that's what happened and a number of the children, at least one, has indicated that they witnessed the same."

The court further noted that Father had a history of being the subject of a 5150 mental health hold and that his interactions with DPSS were continually "angry, erratic, . . . [and] inappropriate . . . . [T]here is a lot of anger and frustration still directed toward the [M]other." In addition, he didn't want to have any interaction with the children, "which is not sort of the normal way in which a human processes these kinds of things . . . . He has a lot of anger and is making many allegations towards [M]other and towards his brother." The court noted that once the case is closed, there will be no DPSS oversight, and the juvenile court had "no idea what Inglewood P.D. is going to do with [Father's] guns." The court found that Father had behaved erratically and should have been the subject of a restraining order. The court added it could not compel the police department to keep Father's guns.

The court stated it intended to issue a TRO because: "I believe the combination of his access to firearms and his history of unstable mental health really makes the issuing of the temporary and then the permanent restraining order something that I would feel neglectful if I did not do, and that I would be allowing the children and the [M]other to be placed at risk." The court explained that, because none of the parties requested a

14

restraining order, the court would issue the most limited restraining order possible, "which would just be a no negative contact restraining order."

When the court asked Mother under oath if Father possessed ammunition, she said he had "[b]oxes and boxes" of "police bullets." When she and Father separated, his brother took the ammunition and Father's weapons. Mother also told the court she would feel more comfortable if the court added to the restraining order a 100-yard stay-away order.

Father objected, arguing that he had moved forward with his life. He lived in a separate residence, remarried, had not recently made threats against Mother or the children, was willing to relinquish his rights to the children, was in the process of "possibly" retiring from the police department, and did everything he was required to regarding his firearms. Father was willing to have the dependency case terminated, with Mother awarded sole legal and physical custody of the children.

At the family maintenance review hearing on March 14, 2023, the juvenile court issued a sua sponte TRO against Father. The court also continued the hearing for the purpose of reviewing Father's firearms compliance and to consider whether to issue a PRO.

G. *March 22 and 29, 2023, Review Hearings*

During the review hearing on March 22, 2023, Father testified he had given all of his firearms and ammunition to the Inglewood Police Department. The court continued the hearing to allow DPSS to obtain further information regarding Father's ammunition.

15

The court issued a TRO requiring Father to stay 100 yards away from Mother, and listed Mother and the children as protected parties.

During the continued review hearing on March 29, 2023, Father again testified he had no firearms or ammunition, and the court found he had complied with the firearm component. The court also ran a CLETS search and did not find Father in possession of any prohibited firearms or ammunition. The court issued a three-year, no-negative-contact restraining order protecting Mother and the children, with a 100-yard stay-away order.

Father objected to the restraining order, arguing there was no evidence of recent abuse, coercive control, or disturbing Mother's peace. Father had moved away, remarried, voluntarily ended visits with the children, and relinquished his parental rights. Father argued that the PRO could "jeopardize his situation as he goes forward and either tries to regain placement or some other sort of position in law enforcement." Father noted that because of his 5150 hold, he was prohibited from access to his firearms for five years. Mother responded that she was nevertheless requesting the 100-yard stay-away order because the 5150 incident caused her "great concern," because she did not know what Father's mental state would be in the future or whether he would regain access to his guns, particularly if he regained his police officer status.

The court noted Father could petition the court to terminate the restraining order early. He could also request a limited exemption under Family Code section 6389 if he needed a firearm for his employment. The court stated it was "extremely concerned" that

16

Father "would be able to possess or have access to a firearm or ammunition." The court therefore issued a PRO protecting the children and Mother against Father, because the court believed that "the family would be at some degree of risk given the underlying facts" mentioned by the court. In addition, the juvenile court terminated its jurisdiction over the children and issued exit orders that Mother have sole legal and physical custody of the children, with Father authorized to have one supervised visit per month for one hour.

## III.

## PERMANENT RESTRAINING ORDER

Father contends the juvenile court erred in issuing a PRO protecting Mother and the children against him. We disagree.

### A. *Forfeiture*

Father argues that Mother forfeited the restraining order issue because she did not request a restraining order during the section 364 family maintenance review hearing proceedings and repeatedly told the court that she was not requesting a restraining order. But, as Father notes in his appellant's reply brief, this court has discretion to consider Mother's arguments in support of the restraining order, even though she told the juvenile court she believed a restraining order was not necessary. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293 ["Although an appellate court's discretion to consider forfeited claims extends to dependency cases [citations], the discretion must be exercised with special care in such matters."].)

17

Here, Mother is not the party challenging on appeal the PRO. Although she did not object to it during the juvenile court proceedings and stated she believed it was not necessary, she is not precluded on appeal from arguing in favor of the order. Furthermore, during the March 29, 2023, hearing, she stated that she favored court-ordered protection from Father. During the March 14, 2023, review hearing, Mother told the court she would feel more comfortable if the court added to the restraining order a 100-yard stay-away order. And during the March 29, 2023, review hearing, Mother again requested a 100-yard stay-away order. Mother said that Father's 5150 hold in March 2022 caused her "great concern" because she did not know what Father's mental state would be in the future or whether he would regain access to his guns, particularly if he regained his police officer status.

Under these circumstances, there was no forfeiture of the issue by Mother. The juvenile court had the discretion to consider Mother's arguments in support of the restraining order, and there was no abuse of discretion in doing so.

B. *Applicable Law*

Under section 213.5, subdivision (a), after a juvenile dependency petition has been filed, and until dismissal of the petition or termination of dependency, a juvenile court may issue an order "enjoining a person from molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, harassing, telephoning, . . . destroying the personal property, contacting, . . . coming within a specified distance of, or disturbing the

18

peace of the child . . . ." This statute also permits the court to issue a protective order that includes protection of a parent.

California Rules of Court, rule 5.630, subdivision (e) provides that proof of a restraining order may include attachments to the restraining order application, declarations, documentary evidence, the juvenile court file documents, and testimony. The court may consider relevant hearsay. (*In re L.W.* (2020) 44 Cal.App.5th 44, 48, fn. 3.)

Issuance of a restraining order under section 213.5 does not require "evidence that the restrained person has *previously* molested, attacked, struck, sexually assaulted, stalked, or battered the child." (*In re B.S.* (2009) 172 Cal.App.4th 183, 193.) Evidence of a reasonable apprehension of future abuse or prospective physical harm is also not required. (*Ibid.*; *In re Bruno M.* (2018) 28 Cal.App.5th 990, 997.) A restraining order may be issued upon evidence that failure to issue the restraining order may jeopardize the safety of the person requiring protection. (*In re B.S.*, *supra*, at p. 194; *In re Bruno M.*, *supra*, at p. 997.) Also, "[t]here need only be evidence that the restrained person 'disturbed the peace' of the protected child. [¶] In this context, *disturbing the peace* means '"conduct that destroys the mental or emotional calm of the other party." [Citation.]'" (*In re Bruno M.*, *supra*, at p. 997.)

"With regard to the issuance of a restraining order by the juvenile court pursuant to section 213.5, appellate courts apply the substantial evidence standard to determine whether sufficient facts supported the factual findings in support of a restraining order

19

and the abuse of discretion standard to determine whether the court properly issued the order. [Citations.]" (*In re Carlos H.* (2016) 5 Cal.App.5th 861, 866.) "[W]e view the evidence in a light most favorable to the respondent, and indulge all legitimate and reasonable inferences to uphold the juvenile court's determination. If there is substantial evidence supporting the order, the court's issuance of the restraining order may not be disturbed. [Citation.]" (*In re Cassandra B.* (2004) 125 Cal.App.4th 199, 210-211.)

C. *Substantial Evidence Supporting the Restraining Order*

Father argues there was no evidence supporting issuance of the restraining order against him. He asserts that, after the gun incident in July 2021, he did not do anything warranting issuance of a restraining order. He moved out of the family home, he remarried, his communications with Mother were non-threatening, he relinquished his parental rights to the children, he had no contact with them since December 2022, he turned in his firearms and ammunition, and he complied with the visitation orders. Father thus contends that issuance of the PRO was unsupported by the evidence and an abuse of discretion. We disagree.

Although some of Father's actions after the July 2021 gun incident could be construed as reflecting a reduced likelihood Father would harm Mother and the children, there was ample evidence that he continued to "'disturb the peace'" of Mother and the children and pose a risk of harm to them. (See *In re Bruno M.*, supra, 28 Cal.App.5th at p. 997.) There is also substantial evidence supporting the trial court's concerns and findings that, because of Father's relatively recent history of mental health instability and

20

hostility toward Mother, Father continued to pose a risk of harm to Mother and the children.

The PRO was issued less than two years after the July 2021 gun incident that triggered the juvenile dependency proceedings. Father admitted pointing the gun at himself, E.F. said she saw Father point the gun at Mother, and the other children either heard Mother tell Father not to point the gun at her or heard about the incident afterward. The incident demonstrated that Father suffered from serious mental health issues, resulting in conduct in July 2021, which traumatized the children and Mother.

After the gun incident, Father moved out of the family home, stayed with G.R. and A.R. for 10 days, was asked to leave, and in August 2021, sent G.R. disturbing emails and texts, and followed G.R.'s wife, A.R., to the market. A.R. and G.R. feared for their safety because of Father's conduct, and A.R. notified DCFS she would be requesting a restraining order against Father.

Father's family enhancement case plan filed in January 2022, required Father to participate in mental health counseling and a psychiatric medication evaluation, and take prescribed psychotropic medications.

In March 2022, Father was placed on a 5150 mental health hold after overdosing on antipsychotic medication, and when he came out of his coma, he threatened to kill police officers. He remained hospitalized for a month on a 5250 hold.

At the hearing on July 22, 2022, the juvenile court ordered Father to complete a psychological evaluation. During the August 15, 2022, review hearing, the court again

21

ordered Father to complete a psychological evaluation. Father never complied with the orders. When Father requested overnight visits in October 2022, Mother told DPSS she was not comfortable unless the court ordered a mental health evaluation for Father. Father continued to demonstrate emotional and mental instability up until the March 29, 2023, restraining order hearing.

Father also continued to commit acts reflecting hostility and anger toward Mother and the children, which supported a finding that Father continued to disturb the peace of the children and Mother. On August 18, 2022, Father became angry with the children during an unmonitored visit and texted Mother to pick up the children early. When Mother arrived. Father threw the children's food at her car and yelled at her. The children were very upset and said Father yelled at them for lying, when they had not been lying. J.F. tried to leave and walk home but Father pulled him back by his shirt. The children told Mother that Father "was saying the F word a lot." On September 7, 2022, Mother provided DPSS with a text from Father accusing her of "poison[ing]the children against him."

After two of the children said they did not want to visit with Father, on November 30, 2022, Father sent the children text messages telling them that he did not want to be their dad anymore and asked to terminate his parental rights. Father also told Mother that he would be relinquishing his rights.

On December 4, 2022, Mother texted DPSS, stating the children did not want to see Father and that J.F. had a very intense nightmare. The children's last visit with

22

Father was on December 24, 2022, after which they stated that they did not want to continue to visit him. In January 2023, Father emailed DPSS, stating that he wished to relinquish his parental rights and asked "if there's anything I need to do or sign." On January 25, 2023, the children again told DPSS that they did not want to continue visiting Father.

Father's animosity toward Mother was apparent in a letter Father submitted to the court at the status review hearing on February 14, 2023. Father wrote that his letter was intended to explain to the court why Mother "is an unfit [M]other and a liar," and that he intended to "petition the court to remedy the situation." Father made numerous derogatory, accusatory statements about Mother, blaming her for the children's emotional and behavioral instability. Father said he was currently on administrative leave and that Mother's false accusations against him and her filing a domestic violence restraining order against him jeopardized his career as a police officer and impugned his reputation. Father included a copy of a January 2022 email from Kyle to Father and his brother, John, maligning Mother.

The record also supports the juvenile court's concern for the safety of Mother and the children, not only because of Father's emotional and mental instability and anger, particularly toward Mother, but also because of the uncertainty as to whether Father, who was still employed by the Inglewood Police Department, would regain access to firearms and ammunition.

During the February 14, 2023, hearing, in which Father waived his appearance, the court stated that it was unaware of any reason why, without a restraining order, the Inglewood Police Department would be prevented from returning Father's firearms to him, because he had not been convicted of a crime preventing him from possessing guns. DPSS reported in July 2022, that Father had said he was on leave from his employment as a police officer at the police department, and might retire early for mental health reasons, if approved. On February 28, 2023, Inglewood Police Department Sergeant De La Torre told DPSS that Father was still employed by the Inglewood Police Department, but was currently under investigation, and the police department still had possession of his firearms. When DPSS contacted Father on March 8, 2023, to confirm that the police department had his firearms, he told DPSS, "'You can contact my police department and you're a f---ing loser,'" and hung up the phone.

During the family maintenance review hearing on March 14, 2023, the court expressed concern and reasonably found that Father had "a lot of anger and is making many allegations towards mother and towards his brother." The court noted that once the case is closed, there will be no DPSS oversight, and the juvenile court had "no idea what Inglewood P.D. is going to do with [Father's] guns." The court reasonably found that Father had behaved erratically and should have been the subject of a restraining order. The court noted that it could not compel the police department to keep Father's guns.

During the hearing on March 29, 2023, in which the court issued the PRO, both Mother and the court expressed their concern about the uncertainty as to whether Father

24

would regain his guns and ammunition. Mother told the court she wanted a 100-yard stay-away order because Father's 5150 incident caused her "great concern." She said she did not know what Father's mental state would be in the future or whether he would regain access to his guns, particularly if he regained his police officer status. When issuing the PRO, the court stated it was "extremely concerned" that Father "would be able to possess or have access to a firearm or ammunition." The court thus reasonably found that, unless it issued the PRO, "the family would be at some degree of risk given the underlying facts."

We conclude that, under the totality of these facts and evidence, the juvenile court did not abuse its discretion when it issued the PRO. Substantial evidence in the record established that during the year and three-quarters period preceding issuance of the PRO, Father had an ongoing history of serious mental health instability and erratic behavior. Father also had not complied with the court's orders to have a psychological evaluation.

In addition, the children no longer wanted to visit Father, who had disowned them. After the children said they did not want visitation with Father, he seemed to emotionally respond in retaliation by requesting his parental rights be terminated. There was also evidence he had angrily and inappropriately acted out at them, including calling them liars, yelling at them, using profanity, and telling them he did not want to be their father anymore. In addition, there was substantial evidence that Father continued to be extremely hostile toward Mother.

Furthermore, there was evidence supporting the court's well-founded concern about Father regaining access to guns and ammunition. Although it was confirmed that Father turned in to the police department all of his firearms, it was uncertain whether he would regain access to them in the future, which would place Mother and the children at risk of harm.

Based on these circumstances and evidence, we conclude that the court reasonably issued the PRO against Father, as to Mother and the children, upon concluding that failure to do so might jeopardize their safety and disturb their peace. (*In re B.S.*, *supra*, 172 Cal.App.4th at p. 194; *In re Bruno M.*, *supra*, 28 Cal.App.5th at p. 997.)

IV.

DISPOSITION

The PRO issued on March 29, 2023, protecting Mother and the children against Father, is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

McKINSTER
Acting P. J.

FIELDS
J.

26